**In re Billie Vester RASBURY, Debtor.**

**In re BILL'S FORESTRY SERVICE, INC., Debtor.**

**UNITED STATES of America, Appellant,**

v.

**Billie Vester RASBURY and Bill's Forestry Service, Inc., Appellees.**

**No. CV–91–H–2445–W.**

United States District Court, N.D. Alabama, W.D.

March 3, 1992.

Jack W. Selden, Richard E. O'Neal, U.S. Atty.'s Office, Birmingham, Ala., Scott Crosby, Neal I Fowler, U.S. Dept. of Justice, Tax Div., Washington, D.C., for appellant.

Marvin E. Franklin, Najjar Denaburg P.C., Birmingham, Ala., Bruce Peter Ely, Tanner & Guin, Tuscaloosa, Ala., for appellees.

## MEMORANDUM OF OPINION

HANCOCK, District Judge.

The court has before it the above-referenced matter on appeal from the United States Bankruptcy Court for the Northern District of Alabama, Western Division 130 B.R. 990; jurisdiction exists pursuant to 28 U.S.C. § 158(a).

The proceeding below involved the debtors' objection to claims filed by the Internal Revenue Service (the "IRS"); the litigation that ensued was a core proceeding under 28 U.S.C. § 157(b)(2)(B). On appeal, the Bankruptcy Court's findings of fact are due to be affirmed unless clearly erroneous. *Birmingham Trust National Bank v. Case*, 755 F.2d 1474, 1476 (11th Cir.1985); *In re Alchar Hardware Co.*, 764 F.2d 1530, 1532 (11th Cir.1985); Bankruptcy Rule 8013. The test to be applied to factual findings "is not whether a different conclusion from the evidence would be appropriate, but whether there is sufficient evidence in the record to prevent clear error in the trial judge's findings." *In re Garfinkle*, 672 F.2d 1340, 1344 (11th Cir.1982). Issues of law and the bankruptcy court's determination of the legal significance that it attaches to its factual findings, however, are to be reviewed de novo. *Citicorp, Inc.*

*v. Davidson Lumber Co.*, 718 F.2d 1030, 1032 (11th Cir.1983).

The record reflects that on September 5, 1991, the bankruptcy court entered an order sustaining the debtors' objections to claims filed by the IRS for withholding taxes (income, FICA and FUTA), interest and penalties allegedly owed by the debtors for the tax years 1986, 1987 and 1988. The bankruptcy court disallowed the IRS claims, finding that the government had failed to meet its burden of proof regarding liability and amount, and that the debtors had demonstrated that they were entitled to the Section 530 "safe harbor" provisions of 26 U.S.C. § 3401.

The memorandum of opinion entered in conjunction with the September 5, 1991 order indicates that the bankruptcy court made the following findings of fact. Beginning in 1976, debtor Billie Vester Rasbury of Winfield, Alabama worked for himself in the logging contracting business. In 1986 he incorporated his sole proprietorship under the name of Bill's Forestry Service, Inc. ("BFS") in Fayette, Alabama. Rasbury became the president of the corporation; he and his wife were and are the sole shareholders.

Rasbury and BFS contracted with forest product companies to supply logs, remove timber from the land of others and pay crews who cut, skidded, bunched and hauled logs. Rasbury provided heavy equipment such as skidders, hydroaxes, knuckleboom loaders and some of the trucks and fuel used to haul the cut timber. The men hired by Rasbury provided some of the trucks used for hauling, along with saws, hand tools, safety equipment and their skills.

At the hearing before the bankruptcy court, three BFS crew members testified that they were paid as independent subcontractors, a practice they claimed was consistent with widespread custom in the logging industry in West Alabama in the 1980s. Thomas F. Collins of Fayette, Alabama, a certified public accountant who handled the Rasbury and BFS accounts for the years at issue (1986, 1987 and 1988), testified that he advised Rasbury of the potential for problems with the IRS in classifying the crew members as independent contractors. Collins further testified, however, that he advised Rasbury that his crew members qualified as independent contractors under the "twenty factors" test (a reference to interpretations by the IRS and various courts of the "usual common law rules" referred to in 26 U.S.C. § 3121(d)(2)).

Rasbury's employees generally testified that they were paid by the ton of wood produced, that they had no "employment" benefits such as health insurance or pension rights other than workman's compensation insurance, and that crew members hired and fired their own coworkers and decided when to work.

Witnesses for the government included three former truck drivers for BFS, one of whom testified that he had worked for Rasbury for about seven months and that the signature on the independent contractor contract under his name was not his.[1] Another former driver testified that he had worked for BFS in 1987–88; the third claimed to have worked for the debtor firm for six months. All three witnesses indicated that they were paid by the day rather than by tonnage. The debtor, however, introduced evidence that all three had signed 4669 Forms attesting that they had paid their own taxes on funds paid to them as independent contractors.

Expert witnesses for Rasbury[2] testified that paying logging crew members as inde-

---

1. This same witness admitted on cross-examination that he had been involved in a physical fight with Rasbury after he quit his job, that he had been convicted of breaking and entering, a felony, and that he had neither paid his taxes nor filed a return with the IRS for 1988, 1989 or 1990.

2. These expert witnesses included 1) Collins; 2) two logging contractors and 15–20 cutters, skidders and logging truck drivers; 3) C. Stephen Richardson, a Tuscaloosa C.P.A. with three logging contractors as current clients and some seven to eight in the past; 4) G. Levert Lawrence, another Tuscaloosa C.P.A. with five logging contractors as current clients and some ten in the past; and 5) Terry W. Jacobs, a registered forester working with Mid–South Forestry Service, Inc. in Gordo, Alabama.

pendent contractors was widespread industry custom in West Alabama in the 1980s. The government introduced as an expert witness Ken Rolston of Panama City Beach, Florida, a former executive with the American Pulpwood Association based in Washington, D.C.[3] and former forester and wood procurement specialist with Kimberly–Clark Corporation in Childersburg, Alabama.[4] Rolston testified that in his opinion crew members who brought "nothing but bare hands" to the job were employees rather than independent contractors. He admitted, however, that a worker who brought his own truck to the job "sound[ed] like an independent contractor," and that the classification was debatable as to crew members who brought their own tools, supplied their own gasoline and hired their own coworkers.

Rasbury testified and government exhibits showed that Rasbury and BFS carried workmen's compensation insurance on crew members for the three years in question. According to Rasbury, the insurance was a requirement to do business with big firms like Weyerhaeuser, and he deducted the cost of the men's coverage from the per-ton rate paid to them, similar to a self-insurance program.

Rasbury and other witnesses for the debtors further testified that Rasbury filed IRS informational Forms 1099 on his men as independent contractors for most of the funds paid them by BFS. Smaller sums were paid to the men and listed on W–2 Forms; these sums were for hours at minimum wage paid for equipment maintenance on "rain days."[5] Rasbury contended that the payment for maintenance was different because it was not the production work of cutting, skidding, bunching, loading and hauling logs, and that he preferred

to base such work on tonnage because the incentive increased production.

Both sides agreed that workers for the debtors signed written contracts indicating that they understood that they were independent contractors and that Rasbury would not withhold income, FICA or FUTA taxes from the amounts they earned under their respective contracts. The evidence was inconclusive as to whether Rasbury filed 1099 Forms for the tax years prior to 1986, although Rasbury testified that he instructed his then-accountant, Joe White (a public accountant but not a C.P.A.), to file these forms once he learned in 1979 that they were required. White testified that he never received the information necessary to fill out the 1099 Forms; the IRS, however, presented no evidence showing that it had verified through its own records that the forms were not filed. Both sides agree that the debtors filed 1096 and 1099 Forms with the IRS and their workers for the years at issue.

Connie Brown, C.P.A. and revenue agent for the IRS, testified that BFS was picked at random for a "TCMP" (Taxpayer Compliance Measurement Program) audit for the 1987 tax year, thereby initiating the sequence of events that resulted in the tax proceeding before the bankruptcy court. According to Brown, related returns are requested as part of the "package audit" requirement, "to see if there is a potential payroll tax issue." Brown testified that in reviewing the returns she noticed that in some cases 1099 and W–2 Forms had been issued to the same persons and that the W–2 Forms were filled out in multiples of $134.00.[6] After reviewing the debtors' records, Brown and the IRS concluded that the debtors' workers should have been classified as employees and that BFS should

---

3. Rolston described the pulpwood association as a trade/lobbying organization which represented more large paper mills and pulpwood purchasers than logging contractors such as debtors.

4. The Kimberly–Clark Mill is located some 100 miles from Tuscaloosa.

5. The amount reported on the W–2 Forms was also the amount reported to the debtors' insur-

ance company for workmen's compensation insurance.

6. The debtor testified and stated in his brief that the men listed on the W–2 forms were being paid minimum wage for "rain day" preventive maintenance. Forty hours at the then-minimum wage of $3.35 per hour would be $134.00.

have been withholding federal income taxes and FICA and FUTA employment taxes.

Collins, however, testified that he and Rasbury were told that if they were able to contact all of the workers who had been paid as independent contractors and have them sign IRS 4669 Forms attesting that each worker had paid his own tax on the compensation reported on the 1099 Forms, the taxes actually paid by the workers would be deducted from any liability assessed against BFS and Rasbury.[7] According to Collins, he and Rasbury were able to obtain the necessary signatures from 94% of the workers; they were unable to find the remaining 6%.

On April 14, 1989, Brown prepared an "unagreed report" alleging that Rasbury owed some $161,502.69 in taxes, interest and penalties. Negotiations between the debtors and the IRS continued into the summer of 1989 but broke down when Rasbury was unable to persuade other logging contractors to come forward with affidavits for the IRS admitting that they also paid their crews as independent contractors.

On June 22, 1989, the IRS issued a letter "proposing adjustments" of $161,502.69 to the debtors' tax obligations for the years 1986, 1987 and 1988. Brown's "unagreed report" was attached to the letter. Rasbury and Collins testified that the debtors began treating crew members as employees effective October 1, 1989, in response, according to Collins, to the IRS audit process.

On April 4, 1990, Rasbury filed his individual Chapter 11 bankruptcy petition, and on July 5, 1990, BFS filed its corporate Chapter 11 bankruptcy petition. There is no evidence that the IRS assessed the taxes allegedly owed by the debtors or perfected a tax lien on the debtors' property prior to the filing of the bankruptcy petitions. On July 20, 1990, and on August 31, 1990, the IRS filed Proofs of Claim against Rasbury and BFS, respectively, for the $161,502.69 in withholding taxes, interest and penalties claimed for 1986, 1987 and 1988.[8] Thereafter, on October 5, 1990, the debtors filed their objection to the IRS's claims.

In resolving the above-described controversy, the bankruptcy court relied on the following conclusions of law:[9] 1) that in

7. The Form 4669, Employee Wage Statement, is a statement made by the wage-earners of a business that the wages paid to them by the company, from which taxes were not withheld, have been reported on their income tax returns, and that the taxes due were paid. Brown testified that the deduction of taxes actually paid by the workers who received the compensation would "abate" liability assessed against Rasbury.

8. On April 30, 1991, the IRS filed an adjusted Proof of Claim for a total of $211,776.02 in taxes, interest and penalties. Brown testified that she knew of no attempt by the IRS to follow up on the 4669 Forms she had asked Rasbury to complete; thus, the total claimed by the IRS is for the maximum taxes due as if none of the workers had paid any such taxes themselves. The Bankruptcy Court asked Brown whether the IRS had computed the taxes actually paid by the 94% of debtors' crew members who had signed the 4669 Forms to determine how much, if any, taxes were actually due. Brown replied, "That abatement is not made until the tax is assessed. There can be no abatement until assessment and there is no assessment because of the bankruptcy." Brown did not explain why the IRS did not compute the actual unpaid taxes for informational or evidentiary purposes.

In its brief filed on November 12, 1991, the government states that such computation was begun at the request of its counsel after discussing the case with the debtors' counsel and agreeing that if in fact the taxes had been paid, then the amount at issue would be significantly less. According to the government, counsel agreed to postpone the trial initially set for early March to provide the IRS with time to research the issue. However, "early research" indicated that the majority of taxes claimed to have been paid by the workers had in fact NOT been paid, and, based on this information and the understanding that the research could take a considerable amount of time, both sides agreed to proceed to trial.

As stated earlier, the record contains 4669 Forms signed by some 94% of the debtors' workers, indicating that such workers were paid as independent contractors. While the government argues that such forms were not "verified" by the IRS, there is no *evidence* challenging the truth of the information contained therein. Nothing of record documents the so-called "early research" conducted by the IRS, which research purportedly contradicts the implications of the 4669 Forms.

9. At the outset the court noted that both sides had presented evidence designed to put the instant case in the larger context of a nationwide, decades-long dispute between the IRS and the forestry products industry over how workers

bankruptcy, the government has the ultimate burden of proving that the liability alleged on its proof of claim is indeed owed by the debtor, whether the taxes are assessed or unassessed; 2) that the bankruptcy context alters the taxpayer's normal burden to prove that his workers are independent contractors, as opposed to employees; 3) that since the government must prove the amount owed, it has the burden of establishing whether the taxpayer was due abatement and whether a penalty should be applied, and 4) that the debtors in this case have the burden of proving, by a preponderance of evidence, that their arrangement with their crew members for the tax years in question qualifies for Section 530 "safe harbor" status.

Applying the above legal standards to the facts, the court found 1) that the IRS had failed to prove the amount identified in its proof of claim because it never established a specific amount due (taxes, interest, or penalty); 2) that the IRS had failed to meet its burden of proving that BFS's crew members were improperly classified as independent contractors; and 3) that the "safe harbor" of Section 530 would apply to the debtors for the tax years 1986, 1987 and 1988. Accordingly, the court ordered that the debtors' objection to the IRS claims be sustained, and that such claims be disallowed.

Both sides agree that the following issues are relevant on appeal: 1) Did the Bankruptcy Court err in placing the ultimate burden of proof upon the government to substantiate its proofs of claim as to the legal liability of the debtors? 2) Did the Bankruptcy Court err in placing the ultimate burden of proof upon the government to substantiate its proofs of claim as to the amount of liability owed by the debtors? 3) Did the Bankruptcy Court err in determining that the debtors were entitled to relief under Section 530 of the 1978 Revenue Act? For reasons set forth more fully below, the court concludes that the bankruptcy court's factual findings are not "clearly erroneous," and that its conclusions of law are correct. Thus, the decision of the bankruptcy court is due to be affirmed.

■■■ As illustrated by the above issues, the proper allocation of the burden of proof is crucial to the resolution of this case. It has long been settled that the burden of proof in the litigation of tax matters generally rests with the taxpayer. *Helvering v. Taylor,* 293 U.S. 507, 515, 55 S.Ct. 287, 291, 79 L.Ed. 623 (1935). In a bankruptcy case, however, the burden of proof with regard to a claim is ultimately upon the claimant. Under Bankruptcy Rule 3001(f), a properly filed proof of claim constitutes prima facie evidence of the validity and amount of the claim. The debtor, however, need only present evidence supporting its objection in order to shift the burden of proving the claim back to the claimant. *See In re Leedy Mortgage Co.,* 111 B.R. 488, 491 (Bankr.E.D.Pa.1990).

■■ Here the government argues that "controlling case law in the Northern District of Alabama and in the Eleventh Circuit holds that a debtor has the ultimate burden of proof in proving that it is not liable for unassessed tax liabilities reflected on a filed proof of claim." The government further argues that the debtor also has the burden of proving that, although it may be legally liable, it is not liable for the amount claimed on the filed proof of claim. In support of its argument, the government cites (while noting that other courts have held otherwise) [10] *In re*

should be classified for withholding tax purposes. The controversy typically has involved a dispute both over how workers should be classified under the twenty "common law" factors and whether the Section 530 "safe harbor" should be applied where the IRS finds a misclassification. While acknowledging that a perspective on the general controversy was helpful, the bankruptcy court emphasized that the central issue before it involved "the equities of the situation of this *particular* individual debtor,

this *particular* corporate debtor for the *particular* years in question in West Alabama." *See* Memorandum of Decision dated September 5, 1991, pp. 11–12.

10. *See, e.g., In re Fidelity Holding Co., Ltd.,* 837 F.2d 696, 698 (5th Cir.1988); *In re Watson,* 456 F.Supp. 432, 435 (S.D.Ga.1978); *In re Premo,* 116 B.R. 515, 524 (Bankr.E.D.Mich.1990) (and cases cited therein); *In re Brady,* 110 B.R. 16, 18 (Bankr.D.Nev.1990).

*Terrell,* 75 B.R. 291 (N.D.Ala.1987), *rev'g* 65 B.R. 365 (Bankr.N.D.Ala.1986), *aff'd w/out opinion,* 835 F.2d 1439 (11th Cir. 1987).

*Terrell* involved the appeal of a judgment entered in a chapter 7 proceeding wherein the bankruptcy court held that the government bore and had failed to sustain its burden of proving by a preponderance of the evidence (1) that the debtor was a "responsible person" for the 26 U.S.C. § 6672 penalty in connection with the failure of two closely held corporations to pay their withholding tax liabilities; and (2) that the debtor's alleged omissions were "willful" for such tax indebtedness to be nondischargeable pursuant to 11 U.S.C. § 523(a)(1)(A). *Terrell,* 75 B.R. at 293. On appeal, the district court held that the bankruptcy court erred as a matter of law in placing the burden of proof on the government in a "responsible officer" case under Section 6672. According to the district court,

> The law is unambiguous. In a responsible officer case, once an assessment is made, the burden of proof, both as to responsibility and willfulness, is on the taxpayer.

**11.** The government argues that any attempt to distinguish the factual scenario in the instant case from that in *Terrell* is "unpersuasive" because (1) the taxes at issue in a responsible person dispute are also at issue in an employee/independent contractor dispute and thus are afforded the same priority in bankruptcy, and (2) if the bankruptcy court had sustained the claims of the government, then Rasbury could have been determined to be the responsible person who would bear the liability to pay the unpaid employment taxes should the corporation be unable to do so. The fact remains that in this case the issue below was not whether Rasbury was the "responsible person" for the purposes of Section 6672, and no such determination was made.

**12.** As the government points out, whether the underlying taxes had been assessed in *Terrell* is "confusing" at best. A chart contained in a footnote in the initial bankruptcy court's decision indicates that the relevant underlying tax liability was unassessed, due to the automatic stay. 65 B.R. at 366. The district court's decision, however, indicates that a tax lien based on the debtor's failure to pay the withholding taxes had been filed and that the IRS had assessed

*Id.* at 295. Accordingly, the district court concluded: "[t]he case law is clear that the taxpayer, even a taxpayer in bankruptcy, has the burden of proof under 26 U.S.C. Section 6672." *Id.* at 296.

The court finds that *Terrell's* application is properly limited to its factual situation. The decision quite clearly deals with the imposition of penalties under Section 6672,[11] which penalties are not sought in this case. Moreover, the holding was based on the assumption that the taxes at issue had been assessed, which is not the case here.[12] Even the cases cited by the government, *Resyn Corp. v. United States,* 851 F.2d 660, 662–63 (3rd Cir.1988) and *Kontaratos v. United States,* 36 B.R. 928, 931 (D.Maine 1984), place the burden of proof on the debtor in situations where assessments were made by the IRS prior to bankruptcy.

The better-reasoned authority[13] suggests that the government should bear the burden of proof in claims litigation, especially where, as here, the taxes and/or penalties at issue have not been assessed. The court therefore concludes that the bankruptcy court correctly placed the ultimate burden on the government to prove, with regard to its claims against the debtors,

penalties under Section 6672. 75 B.R. at 294. Even if the taxes at issue had not been assessed, it is clear that the district court based its holding on an assumption that such an assessment had been made. 75 B.R. at 295 (wherein the court recites the "unambiguous law" that *"once an assessment is been made,* the burden of proof, both as to responsibility and willfulness, is on the taxpayer"). Thus the court refuses to apply the holding in *Terrell* to cases where, as here, the taxes at issue remain unassessed.

**13.** As noted by the court in the *In re Premo* decision:

> [T]he practice in bankruptcy of requiring the claimant to prove his claim is in essence an application of the general rule allocating the burden of proof to the moving party. Those cases which have invoked this rule even when the claimant is a taxing authority have done so on the basis that (1) the Code lacks any provision which distinguishes government claims from claims of private entities ... and (2) the IRS should be "treated like any other claimant under the Bankruptcy Code because the estate is a party in interest and not just the taxpayer."

*In re Premo,* 116 B.R. at 523 (citations omitted).

both the legal liability of the debtors and the amount of said liability.

Applying this standard, the court finds no error in the analysis or the conclusions of the bankruptcy court. To establish the debtors' legal liability, the government had to prove that the debtors' workers were employees and not independent contractors. An employee is defined in 26 U.S.C. § 3121(d)(2) as:

> Any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee.

Regulations 31.3121(d)–1(c), 31.3306(i)–1 and 31.3401(c)–1 all provide, in part:

> [G]enerally, the relationship of the employer and employee exists when the person for whom services are performed has the right to control and direct the individual who performs the services ... it is not necessary that the employer actually direct or control the manner in which the services are to be performed; it is sufficient if he has the right to do so.

The issue, then is whether the taxpayer had the requisite "right to control;" thus, it was the government's burden to prove that Rasbury and BFS *did* in fact have such a right with regard to their workers.

The bankruptcy court, analyzing the evidence presented by the parties under a modified version of the "twenty factors" test,[14] determined that the government had failed to satisfy this burden.[15] Specifically, the court found (1) that loggers historically determined their own hours, and that while Rasbury had assigned his workers to a tract, the crews set their own time and chose their own method of removing the timber;[16] (2) that loggers trained on the job; (3) that only the end result of the workers' services (the delivery of the logs) was integrated into Rasbury's business; (4) that workers cooperated as a team to achieve the greatest productivity, since in-

---

**14.** The factors to be considered in making the determination include the industry's right to control how work shall be done, opportunities for profit or loss, investment in facilities, permanency of relation and skill required in the claimed independent operation. No one factor is controlling, nor is the list complete. *See United States v. Silk,* 331 U.S. 704, 716, 67 S.Ct. 1463, 1469–1470, 91 L.Ed. 1757 (1947). The IRS has compiled a non-exclusive list of twenty factors to be used in analyzing and deciding whether workers are employees or independent contractors. *See* Revenue Ruling 87–41, 1987–1 C.B. 296. These factors address the following considerations: (1) instructions, (2) training, (3) integration, (4) services rendered personally, (5) hiring, supervision and paying assistants, (6) continuing relationship, (7) set hours of work, (8) mandatory full time, (9) doing work on employer's premises, (10) order or sequence (of tasks) set, (11) oral or written reports, (12) payment by the hour, week or month, (13) payment of business and/or travelling expenses, (14) furnishing of tools and materials, (15) significant investment, (16) realization of profit or loss, (17) working for more than one firm at a time, (18) making service available to the general public, (19) right to discharge, and (20) right to terminate.

In addition to the twenty IRS factors, the court also considered four others: (1) industry practice or custom, (2) the intent of the parties (how they viewed the relationship), (3) the existence of written, signed independent contractor agreements, and (4) whether employee-type benefits were provided.

**15.** Both parties agree that not all twenty factors add insight into the logging industry's employment practices (*see* Gov't. Brief filed Nov. 12, 1991, p. 29), and the bankruptcy court did not address all such factors. In its reply brief filed on December 10, 1991, the government states that those factors which it did not address in its earlier brief are either indicia of employee status, namely factors 4 (services rendered personally) and 10 (order or sequence set), or do not provide significant insight into the proper treatment of the workers, namely factor 18 (making a service available to the general public).

**16.** The government relies on testimony from two workers, Robert Sharp and James Brown, that either Rasbury or his foreman told them when and where to work. The testimony of the debtors' witnesses, however, is to the contrary. The bankruptcy court concluded that the more credible evidence indicated that the workers set their own hours and chose their own methods of removing the timber, and the evidence supports such a finding. The fact that Rasbury may have assigned his workers to various tracts does not necessarily establish the requisite "right to control." As the Alabama Supreme Court has pointed out:

> ... the right to control is not established by a showing that the alleged employer retains the right to supervise the alleged employee merely to determine if the employee performs in conformity with the contract.

*See Danford v. Arnold,* 582 So.2d 545, 547 (Ala. 1991).

dividual were paid on a per-ton basis; (5) that crew members hired other crew members;[17] (6) that while it is common for logging crew members to develop a long-standing relationship with one logging contractor, it is also common for workers to leave one contractor for another, or to work for more than one contractor at a time;[18] (7) that Rasbury did not set the hours of work for his crew members[19] (8) that while crew members had to work as the team directed, when the team was not working they were free to work for others; (9) that all of BFS's work was done on tracts assigned by various mills;[20] (10) that crew members set their own order or sequence of tasks; (11) that no oral or written reports were required; (12) that the crew was paid by the ton for log production work;[21] (13) that none of the workers were paid expenses of any kind; (14) that Rasbury and BFS furnished the heavy equipment for its workers, while some of the drivers brought their own trucks and other crew members furnished their own saws, hardhats and other safety equipment;[22] (15) that crew members who supplied their own trucks, chain saws, safety gear or other equipment should be viewed as having a "significant investment;"[23] (16) that

17. The government's witnesses (Robert Sharp, Jerry Knight and James Brown) testified that they were hired by Rasbury and that he did the hiring and firing of crew members. As stated earlier, the bankruptcy court discredited the testimony of Jerry Knight based on the fact that he had been in a fight with Rasbury after quitting his job, was a convicted felon and had not paid his taxes or filed a return with the IRS for 1988, 1989 or 1990. While it is undisputed that Rasbury testified that he did, on occasion, hire workers, he further testified that he did not supervise or pay assistants. Moreover, he, Don Moore and Ray Goodwin all testified that often crew members would hire and fire workers. See Transcript, pp. 40–41; 151; 172–173.

18. The government points out that even the debtor and the debtors' witnesses testified that loggers worked for the debtors on a continuing basis, and that no worker testified that his working relationship was severed due to the completion of a particular job under contract. However, the evidence introduced by the debtors shows that the number of workers hired for the years in question far exceeded the number of workers for the crew or crews at any one time, suggesting a high turnover rate. See Debtors' Ex. 3. Moreover, the testimony indicated that it was not uncommon for workers to leave one contractor for another or to work for more than one contractor at one time.

19. As mentioned earlier, the testimony on this issue is conflicting. However, since the government bears the burden of proof, it is incumbent upon it to produce the greater amount of evidence showing that the debtors did not tell the workers when to work. The government relies on testimony by three of the debtors' former workers, one of which was discredited by the bankruptcy court. The court agrees with the bankruptcy court that such testimony does not constitute the "greater amount of evidence."

20. The government argues that even if the debtors did not own the premises on which work was done, they, and not the workers, were "in control" of the property. The government fails to indicate the evidence on which it bases such an assumption.

21. The government points out that testimony on this issue is in conflict. It places great weight on the fact that while it contacted only three former workers, all three testified that they were paid by the day. As stated previously, the testimony of one former worker was discredited by the bankruptcy court. Rasbury, Moore and Goodwin all testified that workers were paid on a per ton basis of the total timber produced. See Transcript, pp. 32, 148, 171, 175, 177. The government has the burden to prove that the debtors paid their workers by the day; the evidence fails to show that it carried this burden.

22. The court expressly rejected the "bare hands" test articulated by government expert Rolston. Noting that many skilled professionals and craftsmen who operate as independent contractors carry their best, albeit intangible, tools inside their head, the court found the same to be the case with logging crew members. Sept. 5, 1991 order, p. 24.

The government argues that the bankruptcy court overstated the strength of the record to support its holding, pointing out that only one witness testified that he brought his own truck, while three others (Sharp, Brown and Knight) testified that the debtors provided the trucks. The government also points out that while Moore testified that he brought his own equipment to the job, Brown testified that Rasbury provided the chainsaws. Conceding that the testimony is in conflict on this issue, the court once again fails to find that the government produced evidence sufficient to carry its burden of proof.

23. The court agrees with the government that the workers' investment in tools and personal safety equipment was not a "significant investment" in the workings of debtors' business, given that Rasbury admitted he provided most of the heavy equipment critical to the operation of

since crew members were paid by the ton, their profit depended on the timber cut and removed, less their expenses; [24] (17) that crew members could and did work for more than one firm at a time; (18) that workers advertised to logging producers through word-of-mouth; (19) that although Rasbury did, on occasion, hire and fire workers, the crew would also discharge individual members who failed to pull their share of the load; and (20) that each crew member had a right to terminate his relationship with BFS at any time (an indication of an employer/employee relationship).

■ In addition to the above factors, the bankruptcy court also referred to the following considerations: (1) that in the 1980s in West Alabama it was widespread custom to classify loggers as independent contractors; [25] (2) that most of the crew members and Rasbury intended to create an independent contractor relationship; (3) that all of the parties employed as crew members by Rasbury and BFS signed written contracts designating themselves as independent contractors, and that 94% of them, after the fact, signed 4669 Forms attesting that they had paid their own taxes on the money paid to them by BFS; and (4) that with the exception of a limited workmen's compensation program, BFS provided its crew members with no employee-type benefits,

and that BFS provided workmen's compensation to its workers because it was a condition required to do business with large log consumers.

Viewing the evidence as a whole, the court cannot conclude that the findings of the bankruptcy court with regard to the status of debtors' workers were "clearly erroneous." Applying proper legal standards, the court correctly concluded that the government had failed to carry its burden of proving that the debtors' workers for the years at issue were "employees" rather than "independent contractors;" accordingly, the debtors are not liable for failing to withhold federal employment taxes as to these workers.

Because the government failed to establish the legal liability of the debtors, it is not necessary for the court to consider whether the government carried its burden of establishing the *amount* of such legal liability, or whether the debtors carried their burden of showing entitlement to the "safe harbor" provisions of Section 530. Absent legal liability for the taxes allegedly owed, the debtors' objection to the proofs of claim filed by the government were properly sustained, and such proofs of claim were rightfully disallowed. Accordingly, a separate order affirming the

---

said business. The bankruptcy court was incorrect in its application of the legal standards relevant to this issue; the evidence does not show that the workers had a "significant investment" in the debtors' business.

**24.** The government argues that the bankruptcy court applied the legal standard incorrectly in concluding that the workers stood to realize the type of "profit or loss" generally associated with independent contractor status. According to the government, payment by the ton is simply not the equivalent of realizing the requisite profit or loss, and the facts fail to show that debtors' workers were "subject to a real risk of economic loss due to significant investments or a bona fide liability for expenses." The court cannot agree. The facts here are similar to those found in the *E.C. Jones* 1978 WL 1245 case, wherein a tree cutter working for the debtor was determined to be an independent contractor rather than an employee for tax purposes. In making this determination, the court noted that the cutter "had both the opportunity for profit and loss

... the lower a tree cutter could hold his costs, the higher his profit. Such profit clearly depended on [the cutter's] skill and entrepreneurship." *E.C. Jones,* 79–1 U.S.T.C., 1978 WL 1245.

**25.** The government argues that "industry custom" is only relevant in the discussion of the applicability of Section 530, not in the discussion of the common law. Numerous cases, however, have utilized industry custom as an important factor in determining worker classification. *See E.C. Jones v. United States,* 79–1 U.S.T.C., 1978 W.L. 1245 (E.D.Tex.1978) (wherein the court found it was "the custom within the logging industry for tree cutters to perform their services as independent contractors rather than employees"); *Jobbers Warehouse Company v. United States,* 78–1 U.S.T.C. para. 9359, 1977 W.L. 1332 (D.S.D.1977) (jury instructed "that another factor to consider is the custom in the trade or industry ... in arriving at a finding of whether an employer-employee relationship existed in this case"); *Moore v. United States,* 68–2 U.S.T.C. para. 9661 (E.D.Tex.1968).

decision of the bankruptcy court will be entered.

## ORDER OF AFFIRMANCE

In accordance with the memorandum of opinion this day entered, it is ORDERED, ADJUDGED and DECREED that decision of the bankruptcy court entered in the above referenced case on September 5, 1991 is AFFIRMED.