In re **STONE HEDGE PROPERTIES,**
Debtor.

**STONE HEDGE PROPERTIES,**
Plaintiff,

v.

**PHOENIX CAPITAL CORPORATION,**
Defendant.

**Bankruptcy No. 5–93–01086.
Adv. No. 5–95–0428A.**

United States Bankruptcy Court,
M.D. Pennsylvania,
Wilkes–Barre Division.

Sept. 14, 1995.

Brian Manning, Wilkes–Barre, PA, Helen Davis Chaitman, Somerset, NJ, for Debtor/Plaintiff.

Geff Blake, Scranton, PA, Douglas Draper, New Orleans, LA, for Defendant.

## *OPINION*

JOHN J. THOMAS, Bankruptcy Judge.

Confronting the court are legal issues concerning valuation under Federal Rule of Bankruptcy Procedure 3012 and temporary allowance under Federal Rule of Bankruptcy Procedure 3018. Motions to value the claim and to temporarily allow a claim have been filed by Phoenix Capital Corporation, ("Phoenix"), in conjunction with the presentation of separate plans of reorganization filed by the Debtor as well as Phoenix.

Significantly, Phoenix is the principal secured creditor of the Debtor having filed a proof of claim in the amount of Two Million Five Hundred Ninety–Two Thousand Seven Hundred Eighty–Nine and 36/100 Dollars ($2,592,789.36). The Debtor not only disputes the validity of the claim by way of a separate adversary filed against Phoenix, it vehemently opposes the temporary allowance of Phoenix's claim and a determination that Phoenix's claim is secured to any extent.

While these matters are typically presented in expeditious fashion, the critical nature of its disposition in this case together with the obvious animosity that the parties have for each other resulted in a record which took five (5) days to complete. While trial commenced on January 20, 1995, the court's calendar did not allow for completion of the record until February 9, 1995. Seven (7) experts gave testimony including the principal of the Debtor, who is a practicing Certified Public Accountant.

A review of the history of the Debtor's relationship with Phoenix would be helpful.

Stone Hedge Properties is a Pennsylvania general partnership organized in 1988 and situate in Wyoming County, Pennsylvania. The principals of Stone Hedge Properties are members of the Kenia family who decided that the best way to maximize the value of their family farm was to convert it into an eighteen-hole golf course. Financing for that endeavor was secured through PNC Bank. Prior to the bankruptcy, the Debtor and PNC Bank agreed that the debt should be restructured but, unfortunately, the restructuring resulted in creating an obligation that the Debtor could not afford to meet on a regular basis.

On June 7, 1993, the Debtor filed for relief under Chapter Eleven of the United States Bankruptcy Code. On June 23, 1993, PNC Bank sold its paper, then representing approximately Two Million Three Hundred Fifty Thousand Dollars ($2,350,000.00) in debt, to Phoenix for a negotiated consideration of One Million Three Hundred Fifteen Thousand Dollars ($1,315,000.00). Principals of Phoenix were former employees of a PNC Bank subsidiary that was servicing the PNC mortgage. Phoenix was formed for the purpose of acquiring distressed assets for investment.

Phoenix maintains that its debt, for plan purposes, should now be valued at the face amount of the mortgage together with accrued interest, attorney's fees and costs. They further maintain that the collateral securing this debt, i.e. the golf course and its equipment, as well as the housing development which abuts Stone Hedge, should be valued at no more than Two Million Eighty Thousand Dollars ($2,080,000.00) in accordance with the testimony of their expert, John Carl Shultz, Jr.. This would make Phoenix significantly undersecured. This obviously would have a significant impact on the ability of the Debtor to confirm their plan pursuant to the criteria suggested in the case of *In Re John Hancock Mutual Life Insurance Co.*, 987 F.2d 154 (3rd Cir.1993).

The Debtor argues just as strenuously that the Phoenix claim should not be allowed to any extent because of the inequities apparent from the restructuring of the loan and the subsequent assignment of that loan to an entity composed of former employees of the bank. They further argue that should this court allow the claim to any extent, it should be limited to the consideration paid by Phoenix for the mortgage, i.e. One Million Three Hundred Fifteen Thousand Dollars ($1,315,000.00), and not the actual balance due the mortgage of Two Million Three Hundred Fifty Thousand Dollars ($2,350,000.00).

The Debtor further argues that, regardless of the amount to which Phoenix is allowed, the value of the collateral at issue; the golf course, the land development and the equipment, is Four Million Five Hundred Thousand Dollars to Five Million Dollars ($4,500,000.00—$5,000,000.00) and, therefore, Phoenix is fully collateralized.

Pending also is a request for a preliminary injunction filed by the Debtor against Phoenix to prevent them from recording a deed in lieu of foreclosure in their possession that would transfer title of Stone Hedge Properties to PNC Bank, their predecessor in interest, and thus, to their benefit. While the automatic stay under 11 U.S.C. § 362 prevented this from being a concern during the pendency of the bankruptcy, this court concluded that on July 31, 1995, the automatic stay was terminated under 11 U.S.C. § 362(e) thus enabling Phoenix to record the deed absent a temporary restraining order that was subsequently issued.

Furthermore, the Debtor argues that Phoenix should be estopped from seeking to be classified as a general unsecured creditor after it has filed a proof of claim setting forth that its claim was secured and which claim

was void of any reference of a portion of the total claim being unsecured. Additionally, Phoenix's April 1, 1994 plan and disclosure statement both classify it as fully secured. A first amended disclosure statement again described its claim as fully secured and it cast a ballot in favor of its own plan and against the Debtor's plan classifying itself as a Class 4 creditor which, as already referenced, was a fully secured class.

In support, the Debtor cites a series of Third Circuit cases and, in particular, relies upon *Scarano v. Central Railroad Company*, 203 F.2d 510 (3rd Cir.1953), the seminal case in this circuit concerning judicial estoppel. The Debtor cites a substantial quote which, in short, provides that the court should not tolerate the use of inconsistent positions in a case by a litigant. The Debtor, however, failed to provide the first portion of the quote which actually became the rule applied by the court and that rule is that "a plaintiff who has obtained relief from an adversary by asserting and offering proof to support one position may not be heard later in the same court to contradict himself in an effort to establish against the same adversary a second claim inconsistent with his earlier contention ...". *Scarano, supra*, at p. 513.

The court wholeheartedly agrees with this position but notes that there was not a final judgment or order entered by this court concerning the status of Phoenix's claim under Section 506. *Scarano*, therefore, is not controlling.

Likewise, the Debtor provided the following quote from the *United States v. Kepner*, 843 F.2d 755, 760 (3rd Cir.1988): "A party who has gained an advantage by characterizing the law or facts involved in a case should not later be able to contradict that characterization in order to obtain further advantage." The text of the opinion, however, continues with the following: "But that does not mean that a party cannot change its position about what it intends to argue in the future, especially if the full implications of the decision are not yet known at the time of the statement." *Id.* at p. 760. Again, this position is consistent with that provided in Section 506 concerning alternative positions available to debtors and creditors alike depending upon the purpose for which the valuation is requested.

Finally, the court will comment on the case of *Oneida Motor Freight Inc. v. United Jersey Bank* 848 F.2d 414 (3rd Cir.1988). That court indicates a strong interest in achieving finality in chapter eleven cases. It indicated that the goal of finality was supported by the Supreme Court in *Stoll v. Gottlieb*, 305 U.S. 165, 59 S.Ct. 134, 83 L.Ed. 104 (1938) which held that confirmation of a plan acts to bar attempts by the parties to re-litigate any of the matters that could have been raised during the bankruptcy proceeding. See *Oneida, supra*, at p. 417. This court need not remind the parties that the case is not in the posture of a confirmed chapter eleven plan and, therefore, finds nothing prohibitive of the assertion of alternate positions in this hotly contested matter until such time as the parties' positions concerning the valuation and the extent and status of the claim become final by either litigation in this court or by confirmation of a chapter eleven plan which binds not only the Debtor but all creditors.

Phoenix has asked that we value their collateral under Federal Rule of Bankruptcy Procedure 3012 and temporarily allow their claim under Federal Rule of Bankruptcy Procedure 3018. The interplay of Code Sections 1126 and 502 typically require adjudication of the Motion for Temporary Allowance in order to afford the creditor some substantive input in the plan adjudication. 11 U.S.C. § 1126(a) indicates that a holder of a claim allowed under Section 502 may accept or reject a plan. Section 502(a) indicates that a claim is deemed allowed unless a debtor objects. A creditor whose claim is objected to is therefore disenfranchised from voting on the plan unless the objection is adjudicated prior to plan voting or a mechanism, such as temporary allowance, is provided for. Since claims litigation is often drawn out, thereby defeating one of the essential purposes of the Code, i.e. expedited and efficient administration of the bankruptcy estate, the bankruptcy rules provide that, for voting purposes only, the court can temporarily allow a claim in such an amount as the "court deems proper".

At the outset, we wish the parties to make no mistake that we are not, at this juncture,

dealing with an estimation issue under 11 U.S.C. § 502(c), which appears to confine itself to "contingent or unliquidated" claims for distribution purposes.

In essence, the Phoenix claim is a liquidated claim specific in dollar amount but apparently subject to a contingent and unliquidated counterclaim that may offset Phoenix's claim or, in fact, exceed it.

There appears to be no dispute that the amount set forth on Phoenix's proof of claim filed in this case generally represents the balance due on the original mortgage loan to PNC Bank. That amount is Two Million Five Hundred Ninety–Two Thousand Seven Hundred Eighty–Nine and 36/100 Dollars ($2,592,789.36) and includes interest, attorney's fees and costs to the date of bankruptcy filing, i.e. June 6, 1993.

Furthermore, there is apparently no dispute that Phoenix Capital Corporation purchased the PNC debt for One Million Three Hundred Fifteen Thousand Dollars ($1,315,000.00) sixteen (16) days after the bankruptcy was filed. Although the Debtor maintains that the counterclaim against Phoenix would essentially wipe out the Phoenix debt, the Debtor alludes, both in its chapter eleven plan and in the testimony at this hearing, that, regardless of the amount for which the Phoenix claim is allowed, Phoenix is fully collateralized by the golf course, its equipment, and the land development.

On the other hand, Phoenix argues that the testimony of its appraiser establishes that they are under-collateralized by approximately Five Hundred Thousand Dollars ($500,000.00) and, therefore, their claim should be temporarily allowed as an unsecured creditor for approximately Five Hundred Thousand Dollars and a secured creditor for Two Million Eighty Thousand Dollars ($2,080,000.00).

In conjunction with this dispute between the parties, Phoenix contemporaneously with its Motion for Temporary Allowance, requested that the court value its claim.

■ We initially note that the Debtor argues that the Motion by Phoenix to temporarily allow its claim is late, having been filed after the deadline for balloting on the Debt-

or's plan expired. Phoenix notes, quite correctly, that their proof of claim was filed March 17, 1994 and was not objected to at the time the plan was circulated. Moreover, Phoenix's predecessor, PNC Bank, was listed on the original schedules as undisputed. Therefore, it suggests, there was no reason for it to file a Motion for Temporary Allowance.

The Debtor counters by suggesting that its counterclaim, filed on August 30, 1993, to Phoenix's Complaint for a Determination of the Extent, Validity and Priority of its Lien, was tantamount to an objection and, therefore, obligated Phoenix to move for the temporary allowance of its claim in a timely fashion for Phoenix to preserve its voting rights.

The court will summarily dispose of the Debtor's arguments since neither the Code nor the Rules set forth any time limit to file a Motion for Temporary Allowance and, further, since the Supreme Court in *Pioneer Investment Services Co. v. Brunswick Associates Limited Partnership,* 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993), has embraced a flexible approach in chapter eleven cases that would balance the danger of prejudice, the length of delay, the potential impact on the judicial proceedings, the good faith of the parties, and the rationale for the delay. While we decline to suggest that this flexible approach should be extended to chapter seven cases, the court has no hesitancy in concluding that the Phoenix/Stone Hedge controversy is the very controversy that drives the chapter eleven. To suggest that Phoenix should somehow be "ambushed" into surrendering its voting rights in this manner would run counter to the very equities upon which this court must fundamentally operate.

The Motion for Temporary Allowance will be entertained.

We must first address the burden of proof in such a request. Judge Russell's treatise on bankruptcy evidence utilizes *In Re FRG, Inc.,* 121 B.R. 451 (Bkrtcy.E.D.Pa.1990) to conclude that the burden of estimating a claim to temporarily allow it follows the same rules as deciding objections to proofs of

claim. *Russell, Bankruptcy Evidence Manual*, § 301.47 at p. 245 (1994).

■ Federal Rule of Bankruptcy Procedure 3001(f) indicates that an executed and filed proof of claim constitutes prima facie evidence of the validity and amount of the claim. Nevertheless, the Debtor need only present evidence supporting its objection to shift the burden of proving the claim to the claimant, who bears the ultimate burden of proving the claim. *In Re Rasbury*, 141 B.R. 752, 757 (N.D.Ala.1992).

Although not controlling in this case, we cannot help but note that this approach appears to be inconsistent with the pre-Code case law that, at least for purposes of electing a trustee, a request to temporarily allow a claim for voting purposes placed the "burden of establishing the invalidity of the claim ... on the objector". *12 Collier on Bankruptcy*, ¶ 207.06 at p. 2–117 (14th Ed., 1975).

While this may cause us concern as to the proper allocation of the burden of proof in a case where the evidence is sparse, our decision is limited to adjudication of the rights of the parties for voting purposes only and the evidence is compelling that voting rights should be preserved.

■ Speaking generically, the Third Circuit in *Bittner v. Borne Chemical Co., Inc.*, 691 F.2d 134 (3rd Cir.1982) viewed the principal considerations when estimating a claim to be an "accommodation to the underlying purposes of the Code". *Id.* at p. 135. If this court were asked to estimate the claim of Phoenix for purposes of distribution, we surely would be driven by the "... legal rules which ... govern the ultimate value of the claim". *Id.* at p. 135. Since Section 502(c) is written in language mandating the court to act, I would have no discretion in adjudicating such request.

Compare that direction with the option the court is given in Rule 3018(a) which specifically suggests that the court "*may* temporarily allow the claim in an amount which the court deems proper for the purpose of accepting or rejecting the plan". [Emphasis ours.]

■ We view the following factors as critical in considering whether we shall temporarily allow the Phoenix claim and, if allowed, the degree to which we make such allowance: (1) the manner in which the claim was initially scheduled by the Debtor; (2) the proof of claim filed by the creditor; and (3) the objection (adversary counterclaim) of the Debtor.

Since our principal consideration must be an accommodation of the underlying purpose of the Code, we first must identify what that purpose is.

"The fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources." *National Labor Relations Board v. Bildisco & Bildisco*, 465 U.S. 513, 528, 104 S.Ct. 1188, 1197, 79 L.Ed.2d 482 (1984) citing H.R.Rep. No. 95–595, p. 220 (1977).

The statutory scheme advancing the reorganization contemplates that both secured and unsecured creditors will have a "weighted" influence in the eventual program by which a debtor solves its financial dilemma.

■ Since both the Debtor's plan and the Phoenix plan recognize the possibility that the Phoenix claim would eventually be allowed, we recognize no fundamental concern in temporarily allowing the Phoenix claim to some degree. Additionally, the Debtor recognizes the PNC claim (now held by Phoenix) as undisputed, liquidated and non-contingent in its original schedules. No one, including the Debtor, has argued that there was a lack of consideration for the PNC–Stone Hedge loan. Rather, the Debtor argues that Phoenix should not be allowed to reap an exorbitant profit from its One Million Three Hundred Fifteen Thousand Dollar ($1,315,000.00) investment when it may have benefitted from "insider" information. To a limited degree, and in a context that only permits this court to cursorily examine that issue, the Debtor's point is well-made and there is a possibility that some part of the Phoenix claim will be disallowed.

■ The courts have long considered that bankruptcy courts were essentially courts of equity and the proceedings in those courts

were inherently proceedings in equity. *Pepper v. Litton* 308 U.S. 295, 304, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939). Since we sit as a court of equity in passing on the allowance of claims (*Id.* at p. 307 and 60 S.Ct. at p. 245), then necessarily we sit as same in passing on the temporary allowance of claims. While it violates no elemental principal to award a claimant the profits attendant to its good investment, we cannot help but be mindful of the allegations of surreptitious conduct suggested by the Debtor. While such allegations alone are insufficient to deny temporary allowance of the entire claim, it does cause this court to hesitate allowing this claim in a manner never originally contemplated by the parties, i.e. as unsecured. When this bankruptcy was filed, the Debtor posited in its schedules that Phoenix was totally secured. When it filed its chapter eleven plan, it adopted the same premise. When Phoenix proposed its chapter eleven plan, it considered itself fully secured. Presumably, when the prepetition creditors of the Debtor dealt with Stone Hedge, they considered PNC Bank, predecessor of Phoenix, to be fully secured. Although we have yet to consider the valuation of this collateral, we herein conclude that the claim of Phoenix should be temporarily allowed up to the value of its collateral or its debt, whichever is the lesser, and denied for any amount in excess thereof. This would allow Phoenix to vote as a secured creditor, which was their historical posture, but not as an unsecured creditor, a position never anticipated by any party prior to the case. Of course, all parties recognize that the impact of this decision affects only the voting on the plan and is not any indication of the eventual disposition of the pending adversary action between the parties.

Next, we must address the valuation of the collateral.

■ We will divide that collateral into two (2) components, i.e. the golf course and equipment and, secondly, the land development. Testifying for Phoenix was John Carl Shultz, Jr. and Laurence A. Hirsch, while appearing for the Debtor was James Nasser, Kevin Yeanopolos and Donna LaBarr. Also testifying for the Debtor was R. Parker Lacorgne, a principal of Phoenix. Mr. Shultz and Mr. Hirsch are both members of the appraisal institute (MAIs). Both have had significant backgrounds in the appraisal and valuation of golf courses nationally. Both were called upon by the creditor Phoenix to opine as to the value of the Stone Hedge golf course although Mr. Hirsch was originally asked to testify merely as to the quality of the Shultz appraisal.

Mr. Shultz testified as to the value of both the golf course and land development. Mr. Hirsch's testimony was limited to a "valuation" as opposed to an appraisal and that valuation was limited to the golf course.

James Nasser was the Debtor's appraiser and he gave opinions as to the value of the golf course and the land development. These opinions were presented in somewhat of a convoluted manner in that Mr. Nasser was originally asked in May, 1994 to give an as-completed appraisal of the golf course and land development to Stone Hedge's principal lender prior to its completion. It was during a break in testimony that Mr. Nasser computed an "as is" value by backing out various completion costs of items to be done and thereby arriving at a current value for the course and the development.

Kevin Yeanopolos was a Certified Public Accountant and a valuation expert who basically verified some of the numbers utilized by Mr. Nasser in his approach.

We comment at this juncture that Daniel Kenia, a principal of the Debtor and a Certified Public Accountant, not only opined as an owner as to the value of the property, but utilized his expertise in accounting to impeach the methodology used by the various experts including his own expert, Mr. Nasser.

John Carl Shultz, Jr. is a member of the Society of Golf Appraisers and has appraised approximately thirty (30) golf courses in the past three (3) years. He appraised the Stone Hedge golf course on behalf of PNC Bank in early 1993. He originally concluded that the golf course was valued at One Million Seven Hundred Thousand Dollars ($1,700,000.00) but subsequently reduced that valuation to One Million Two Hundred Fifty Thousand Dollars ($1,250,000.00) after consulting with a

PNC Bank official. He attributed that reduction to errors in his original appraisal pointed out to him by the Bank. The reduction was never specifically explained except to blame mathematical errors in pro shop sales and green fees.

While undoubtedly an expert, Mr. Shultz' twenty-six percent (26%) reduction in value of the golf course was a startling adjustment which suggested that his approach to valuation was too "casual". It should be noted that Mr. Shultz' cost approach to valuation indicated an "as is" value of Three Million Three Hundred Thousand Dollars ($3,300,-000.00). His sales comparison approach suggested a range in values of One Million Two Hundred Fifty Thousand Dollars ($1,250,-000.00) to One Million Seven Hundred Thousand Dollars ($1,700,000.00) and the income approach changed from One Million Seven Hundred Thousand Dollars ($1,700,000.00) to One Million Two Hundred Fifty Thousand Dollars ($1,250,000.00) by reason of his numerical adjustments. We also point out that his original appraisal identified the "real property" not including fixtures, furnishings and equipment as being worth One Million Three Hundred Seventy Thousand Dollars ($1,370,000.00) while the adjusted appraisal attributed that same golf course real estate as being worth Nine Hundred Sixty Thousand Dollars ($960,000.00), a downward adjustment approaching thirty percent (30%) for the real estate alone.

Frankly, the court lent greater weight and had more confidence in the testimony of Laurence A. Hirsch who also had significant qualifications as an appraisal expert with substantial experience in valuing golf courses while also engaged by a national magazine in rating the top one hundred (100) courses in the nation. He indicated that he appraised over fifty (50) golf courses in the past two (2) years. While not retained to appraise Stone Hedge, he did give valuation testimony based on the Shultz appraisal and on pro forma utilizing numbers, the majority of which were supplied by the Debtor.

It should be noted at this time that, during the proceedings, the Debtor intimated that its original intent to build a clubhouse on the course may no longer be the case.

The court is advised that there are only fourteen thousand (14,000) golf courses in this country. Because such a commodity is rather limited, we discounted the testimony and the appraisal of Mr. Nasser relative to the golf course. In the court's view, a valuation of the golf course vis-a-vis other golf courses in the locale was far too limited to be of significant value. Moreover, Mr. Nasser's experience in evaluating golf courses was also relatively limited. This takes nothing away from Mr. Nasser's qualifications as a well-experienced expert in the field of appraising. Nevertheless, we view the market for golf courses as a national market rather than a local one.

While not having the opportunity to perform a full-scale appraisal as was given Mr. Shultz or Mr. Nasser, it is the court's view that Mr. Hirsch provided the most forthright and substantiated opinion of value. His analysis of the value of the facility criticizing the Schultz appraisal and utilizing the pro forma statements that he prepared in expedited fashion was concise and to the point. He was the only appraiser that valued the property as of the date of the hearing. He withstood cross examination well. By opining as to the value of the golf course without a clubhouse, i.e. One Million Nine Hundred Thousand Dollars ($1,900,000.00), and by reducing same by the anticipated expenditures for necessary tournament cart building, maintenance building and paving the cart paths at Four Hundred Thirty–Three Thousand Dollars ($433,000.00), he provided to this court a specific measurement of value which will guide our decision. We therefore conclude that the value of the golf course and the furnishings, fixtures and equipment is One Million Four Hundred Sixty–Seven Thousand Dollars ($1,467,000.00).

Turning our attention to the land development, the reason we gave little weight to the Nasser appraisal with regard to the golf course, i.e. his failure to examine the national market, does not detract from the quality of his appraisal relative to the land development. Moreover, his rather significant experience with regard to properties in the community allows us to lend greater

weight to his opinion of value relative to land development. It is for that reason that we accept that opinion in finding that the land development should be valued at One Million One Hundred Thousand Dollars ($1,100,-000.00).

This discussion allows us to find that the value of the Phoenix collateral, pursuant to its Motion to value same, totals Two Million Five Hundred Sixty–Seven Thousand Dollars ($2,567,000.00). Having already determined to temporarily allow Phoenix's claim as secured up to the value of its collateral or the amount of its debt, whichever is less, and having concluded that insufficient cause has been demonstrated at this juncture to reject the Phoenix proof of claim of Two Million Five Hundred Ninety–Two Thousand Seven Hundred Eighty–Nine and 36/100 Dollars ($2,592,789.36), we conclude that the claim of Phoenix should be temporarily allowed as a secured claim in the total amount of Two Million Five Hundred Sixty–Seven Thousand Dollars ($2,567,000.00). To the extent that this renders the balance of their claim, i.e. Twenty–Five Thousand Seven Hundred Eighty–Nine and 36/100 Dollars ($25,789.36), unsecured, the court will deny the Motion to temporarily allow any part of Phoenix's claim as unsecured for the reasons enunciated earlier in this opinion.

The court is satisfied that a preliminary injunction should issue against Phoenix preventing them from taking any steps commencing, continuing or enforcing against the Debtor or against property of the estate any actions or proceedings without the expressed consent of this court. We issue this injunction for the following reasons. First, both Phoenix and the Debtor have proposed plans providing one hundred percent (100%) payouts to unsecured creditors. This suggests that there is a strong or substantial likelihood of success in the confirmation of a plan, albeit possibly not one currently on file. Secondly, the Debtor has shown irreparable injury if the injunction does not issue. Phoenix has in its possession a deed for the Stone Hedge real estate executed and granting to PNC Bank, its predecessor, all right, title and interest in the Stone Hedge properties. Recording this deed would effectively kill the bankruptcy. Third, we fail to see how issuing a preliminary injunction would cause substantial harm to Phoenix or others. Phoenix paid One Million Three Hundred Fifteen Thousand Dollars ($1,315,000.00) for their position that we, today, value at Two Million Five Hundred Sixty–Seven Thousand Dollars ($2,567,000.00). If there is any harm shown Phoenix, it is harm to the significant profit that they stand to make upon liquidation of their debt. Fourth, we perceive that the public interest would not be impacted by either the issuance or the non-issuance of the preliminary injunction.

Furthermore, since we temporarily conclude that Phoenix is not over-collateralized, they have shown no entitlement to accruing interest on their claim at this juncture. We accordingly issue the preliminary injunction without any requirement by Stone Hedge to make regular payments to Phoenix. The preliminary injunction will stand until such time as we decide the issuance of the permanent injunction.

Our Order with regard to this Opinion was filed September 8, 1995.

### ORDER

The Motion of Phoenix Capital Corporation to temporarily allow their claim for voting purposes under Federal Rule of Bankruptcy Procedure 3018(a) is granted in part and denied in part. Phoenix's claim is temporarily allowed as a secured claim only in the amount of Two Million Five Hundred Sixty–Seven Thousand Dollars ($2,567,-000.00). To the extent that the claim may be unsecured, temporary allowance is denied.

The Phoenix collateral is valued at Two Million Five Hundred Sixty–Seven Thousand Dollars ($2,567,000.00) by attributing One Million One Hundred Thousand Dollars ($1,100,000.00) to the value of the land development and One Million Four Hundred Sixty–Seven Thousand Dollars ($1,467,000.00) to the golf course, its furnishings, fixtures and equipment.

Phoenix Capital Corporation is preliminarily enjoined from utilizing any steps to effect collection of its debt and a stay, equivalent in all respects to the Section 362 automatic

stay, is put in place until such time as this court decides the issue of the permanent injunction.