**In re COMPASS MARINE CORPORATION,**
Debtor.

**Bankruptcy No. 86–04541S.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Aug. 27, 1992.

Motion for Reconsideration Oct. 28, 1992.

---

Barry A. Furman, Furman & Halpern, P.C., Bala Cynwyd, Pa., H. Marvin Mercer, III, Krusen Evans & Byrne, Philadelphia, Pa., for debtor.

Beverly A. Moses, U.S. Dept. of Justice, Washington, D.C., for I.R.S.

Frederic Baker, Philadelphia, Pa., Asst. U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

Presently before the court is the Objection of the Debtor, COMPASS MARINE

CORPORATION ("the Debtor"), to a portion of the claim filed against it by the Internal Revenue Service ("IRS") for alleged unpaid federal withholding ("FICA") and unemployment ("FUTA") taxes for the years 1982 through 1986. The Debtor contends that it is not liable for the disputed taxes because the workers for whom the IRS alleges FICA and FUTA taxes were due were properly classified by it as independent contractors rather than as employees subject to these taxes. In the alternative, the Debtor argues that, if these workers are deemed employees rather than independent contractors, it is absolved from payment of these taxes under the "safe harbor" provisions of Section 530 of the Revenue Act of 1978, Pub.L. No. 95–600, as amended and codified at 26 U.S.C. § 3401, Note (1992) ("Section 530").

The resolution of Debtor's Objection presents four (4) principal issues to the court: (1) whether the allocation of the burden of proof in this proceeding is governed by that applied generally in bankruptcy claims litigation or that applied generally in tax litigation; (2) whether, applying this burden, the workers at issue were proven to be properly classified as independent contractors; (3) if the workers classified as independent contractors are properly deemed employees, whether the Debtor is excused from paying these taxes under Section 530; and (4) if the IRS' claim is valid, whether the claim should include post-petition interest, taking into consideration 11 U.S.C. § 502(b)(2).

Following a two-day trial on this matter and a review of the Briefs submitted by the interested parties, we find that the Debtor's Objection to the IRS' claim must, except as to a portion of the post-petition interest claimed, be denied. The Debtor concedes, perhaps unavoidably, that it bears the burden of proving that either the workers were in fact independent contractors or that Section 530 applied. We conclude that, under the 20 (twenty)-factor (and then some) common-law tests applied, the workers were employees subject to FICA and FUTA taxes, and not independent contractors. Secondly, we find that the Debtor is not entitled to the protection afforded by Section 530. We do agree that a portion of the interest and the penalties now claimed by the IRS cannot be sustained.

## B. FACTUAL AND PROCEDURAL HISTORY

The underlying voluntary Chapter 11 bankruptcy case was initiated by the Debtor on September 30, 1986. At the time of its filing, the Debtor operated a marine towing service which transported and delivered barges and marine fuels.

On January 2, 1987, the IRS filed Proof of Claim No. 15 in the amount of $359,579.38 for FICA and FUTA taxes for tax years 1982 through 1986. It subsequently amended the claim on October 20, 1988 (Proof of Claim No. 35); November 6, 1988 (Proof of Claim No. 38); and November 29, 1988 (Proof of Claim No. 42). The latter claim, which superseded all of the IRS' previously-filed proofs of claim and is hereafter referenced as "the Claim," listed federal taxes in the amount of $595,399.27, plus interest and penalties. The claim was comprised of (1) $400,437.37 for unpaid 1984–1986 FICA and FUTA taxes for the Debtor's employees; and (2) $194,961.90 for 1982–1986 FICA and FUTA assessments for workers re-classified from independent contractors to employees.

On January 19, 1989, the Debtor filed an Amended Liquidating Plan ("the Plan"), which provided that the Debtor would sell all of its assets to Christiana Marine Service Corp. ("Christiana"), a newly-formed corporation owned by William S. Bates, a shareholder and the principal officer of the Debtor. The Debtor proposed to fund the Plan with the payment received from the sale to Christiana. The Plan provided that the IRS claim of $400,437.37 for unpaid FICA and FUTA taxes for Debtor's employees would be paid in full over four and a half (4½) years. No provisions were made for payment of the $194,961.90 FICA and FUTA taxes assessed for the re-classified workers because the Debtor believed these claims were unwarranted.

The Plan was confirmed on May 3, 1989. Thereafter, the Debtor consummated the sale of its assets to Christiana.

The court scheduled a status hearing on the Debtor's case for December 4, 1991, as there had been no docket entries in the case since final compensation was awarded to the Debtor's general counsel on July 16, 1990. That status hearing was subsequently continued, at the request of the Debtor's general counsel, to February 5, 1992, to clear up a then-unexplained alleged underlying tax dispute. On the latter date, since no party appeared, we assumed the tax dispute had been resolved, and we issued a Final Decree closing Debtor's bankruptcy case. Thereafter, on February 25, 1992, the Debtor's general counsel filed a Motion to Reopen Case and Vacate the Final Decree ("the Motion") and the Debtor's special counsel filed the Objection to the $194,961.90 component of the Claim which is presently before us ("the Objection").

Following a hearing of March 18, 1992, on the (unopposed) Motion, we entered an order reopening the case and vacating the Final Decree for the limited purpose of deciding the Objection. Trial of the Objection was scheduled for April 8, 1992. It was continued at the mutual request of the Debtor and the IRS to June 10, 1992, on a must-be-tried basis, in order that the parties could complete discovery. Subsequently, we denied the parties' request that trial of the matter be continued for an additional six months, although our crowded schedule on June 10, 1992, led to a last, brief continuance.

On June 18 and 19, 1992, a trial on the Objection was conducted. The Debtor offered as witnesses, Bates; James Anderson, an alleged expert in the practices of tugboat companies; Bernard Daly, the Debtor's accountant; and Thomas Teague and Roy A. Banks, who were both present employees of Christiana and were two of the persons identified as one-time independent contractors and subsequent employees engaged by the Debtor.

In support of its claim, the IRS proffered the testimony of IRS Agent John Gilbert and several subpoenaed individuals who worked and were classified as independent contractors by the Debtor. They included assistant engineer/engineer David Beach, dispatcher Stephen Stevenson, mechanic and equipment manager Andre Armbruster, repairman and deckhand Edward Federeco, and engineer David Creedon. Although the IRS had submitted a pre-trial Brief, at the close of the hearing, we entered an Order allowing the parties to submit Opening Briefs simultaneously by July 17, 1992, and Reply Briefs by July 24, 1992. Both parties submitted timely opening and Reply Briefs.

## C. FINDINGS OF FACT

1. The Debtor is a Pennsylvania corporation organized in 1975 by Bates and several other individuals for the purpose of acquiring a tugboat as a hobby. At the time the company acquired the tugboat, Bates held a Coast Guard license to operate the boat. Bates has also attained a college degree and a master's degree in international finance at the prestigious Wharton School of Finance of the University of Pennsylvania.

2. In 1976, initially in order to meet the costs of maintaining the boat, the owners began to provide towing services in the harbor of Philadelphia. Thereafter, the owners acquired additional tugboats by forming affiliated corporations which purchased the boats in their names. The Debtor then hired its first employee, a licensed tugboat captain named Ron Cellinesi.

3. Since the operation of a tugboat requires a crew, the Debtor was obliged to obtain the services of additional persons. A tugboat crew normally consists of a captain, a mate, an engineer, an assistant engineer, and an able-bodied deckhand. If the boat were engaged for an extended period of time, the crew would also include a cook. The captain and the mate piloted the tugboat. The engineer and assistant engineer were responsible for overseeing and insuring the operation of the tugboat's engine, equipment, and machinery. The deckhand performed any miscellaneous tasks required for the efficient operation of the

tugboat. The cook prepared the meals for the crew.

4. In addition to its tugboat workers, generally referred to as afloat workers, the Debtor also retained workers in its shipyard to repair and maintain its boats and docks. Known as ashore workers, these included mechanics, welders/burners, and dockworkers.

5. The number of workers required by the Debtor varied, since the towing industry is subject to fluctuations in activity and experiences periods of both high and low activity. Consequently, the Debtor hired workers as both employees and independent contractors. The employees were guaranteed a 40–hour work-week and provided benefits, including health and vacation benefits. The contractors were hired on an as-needed basis and were neither guaranteed a 40–hour work-week nor provided benefits.

6. The salary of the employees and contractors were based on hourly rates. Although the amount of the workers' salaries were referred to by a daily amount, they were calculated by multiplying the hourly rate by the number of hours worked.

7. In 1984 the IRS, through its agent Gilbert, conducted an audit of an affiliate of the Debtor organized to own one of the boats, Tug Magic Co. ("Tug Magic"), as a potential illegal tax shelter for its owner. Since the Debtor and Tug Magic filed one consolidated return for federal employment taxes, the audit was extended to include the Debtor's federal tax returns. The audit included a review of the Debtor's payroll records and discussions with Bates regarding the operations of the Debtor and the duties of the various workers. Based upon his review of the records and his discussions with Bates, Gilbert concluded that a reclassification of the independent-contractor workers as employees was warranted.

8. Gilbert reached his conclusion regarding reclassification because he found virtually no difference in the positions held by the employees and independent contractors and he found that, within three to six months after being brought on as independent contractors with the Debtor, almost all of these workers were accorded employee status. Gilbert found that the relationship between the Debtor and its afloat workers, mechanics, and administrative personnel was that of employer and employee because the Debtor controlled or had the right to control these workers. Gilbert opined, however, that the dockbuilders and electricians were correctly labeled as independent contractors, since the duties they performed were not continuous, and they were not directly engaged in the Debtor's primary business of marine towing.

9. Thereafter, the IRS re-classified the contractors identified by Gilbert as employees. The IRS held the Debtor liable pursuant to §§ 3509 and 3301 of the Internal Revenue Code ("IRC") for the payment of its share of the FICA taxes and for FUTA taxes for the years in question. Subsequently, an assessment was issued against the Debtor for additional sums due for failure to classify these workers as employees in the years 1982–1984.

10. The Debtor opposed the IRS' findings that the re-classified workers were independent contractors. It reasoned that the workers were independent contractors because they were hired on an "as needed" basis. The Debtor claimed that it engaged workers to perform specific jobs and, that, when those jobs were completed, the obligation between the worker and the Debtor ceased to exist. In addition, the Debtor stated that it did not direct, control, or supervise the contractor-workers. Rather, it claimed to direct only the ultimate result, and that the workers were skilled laborers not subject to "on the job" supervision.

11. The testimony of Debtor's former contractor and employees indicates, however, that the positions held by the independent contractors and the employees were essentially the same and that any differences which existed were de minimis. Most workers began as independent contractors and, if performing satisfactorily, were brought on as employees. Both Beach and Armbruster testified that, when they were converted from contractor to employee status, their job duties did not

change and remained the same. Further, they testified that it was not possible to distinguish a contractor-worker from an employee on the basis of a worker's job duties. Therefore, unless the worker divulged same, other workers did not know whether a particular worker was classified as a contractor or an employee.

12. The testimony of the former workers also revealed that the Debtor provided almost all of their necessary tools and equipment. The employees and independent contractors alike supplied only small tools for their personal use. In addition, Armbruster and Creed testified that, as contractors, they incurred expenses for which the Debtor reimbursed them when travelling to various locations to repair the Debtor's boats or when going to other ports to man the Debtor's boats. Further, the workers testified that the Debtor provided all meals to all workers when they travelled on a boat.

13. Bates testified that in 1985 the Debtor's workers attempted to form a union, which he claimed was ultimately used by a New York City competitor to destroy the Debtor, leading to the Debtor's financial difficulties. As a result of the union activities, the Debtor engaged a labor lawyer. The Debtor was advised by this lawyer that only employees were eligible to vote in the union election and that independent contractors were deemed ineligible to participate. However, the lawyer's advice regarding the status of the contractors was limited to labor-law issues.

14. The Debtor and the IRS stipulated to the amounts of the potential FICA and FUTA tax liabilities for 1982 through 1986 as correct, since these were based upon an actual examination of the Debtor's records. The Debtor also stipulated that it was liable for the unpaid 1984–86 taxes which it was paying through the Plan.

15. Although Gilbert testified that he believed that none of the allegedly misclassified workers paid any income taxes, all of the workers who testified stated that they ultimately had paid the required federal taxes on the monies earned from the Debtor. Gilbert admitted that the independent contractor-employee distinction was often blurred by employers, suggesting that the classification of the court's wife and his own wife as independent contractors by their respective employers may be improper.

16. Although the workers may in fact have paid taxes on the monies earned from the Debtor, the Debtor is not entitled to a credit for these payments, since the IRS only seeks payment of the employer's share of these taxes. The IRS and ultimately the Government therefore did suffer a loss of revenue due to the Debtor's classification of the workers as independent contractors.

## D. DISCUSSION/CONCLUSIONS OF LAW

### 1. DISPOSITION OF THE BURDEN OF PROOF AS TO OBJECTIONS TO TAX CLAIMS GENERALLY IS NOT DETERMINATIVE OF THE OUTCOME OF THIS DISPUTE, AS THE DEBTOR CLEARLY BEARS THE BURDEN AS TO THE CLOSEST ISSUE, *I.E.*, WHETHER THE REQUIREMENTS OF SECTION 530 WERE MET.

■ As an initial matter, we address the allocation of the burden of proof between the parties in this proceeding. Generally, in bankruptcy claims litigation

[t]he burden of proof ... rests on different parties at different times. Initially, the claimant must allege facts sufficient to support the claim. If the averments in his filed claim meet this standard of sufficiency, it is *"prima facie"* valid. *In re Holm*, 931 F.2d 620, 623 (9th Cir. 1991) (quoting 3 L. King, *Collier on Bankruptcy* § 502.02, at 502–22 (15th ed. 1991)). In other word, a claim that alleges facts sufficient to support a legal liability to the claimant satisfies the claimant's initial obligation to go forward. The burden of going forward then shifts to the objector to produce evidence sufficient to negate the *prima facie* validity of the filed claim. It is often said that the objector must produce evidence equal in force to the *prima*

*facie* case. *Id.; see In re Windsor Communications Group, Inc.*, 45 B.R. 770, 773 (Bankr.E.D.Pa.1985). In practice, the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency. If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence....

*In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3rd Cir.1992). *See generally*, 11 U.S.C. § 502(a); and Federal Rule of Bankruptcy Procedure ("F.R.B.P.") 3001(f). This method of allocating the burden of proof is premised on the rationale that a proof of claim, if unchallenged, is deemed allowed. However, if challenged, a bankruptcy claimant is merely in the position of that of a civil plaintiff who, in a non-bankruptcy proceeding, bears the burden of proving its claim against the defendant under non-bankruptcy law. *See In re Premo*, 116 B.R. 515, 518 (Bankr.E.D.Mich.1990); *In re Green*, 89 B.R. 466, 474 (Bankr.E.D.Pa.1988); and *In re Lewis*, 80 B.R. 39, 40–41 (Bankr.E.D.Pa.1987).

However, a potential conflict arises when the claim in dispute, if litigated outside of the bankruptcy court and governed by non-bankruptcy law, requires a different allocation of the burden. Specifically, in the area of tax litigation, as is the matter involved herein, the taxpayer is deemed the party that bears the burden of proving that the tax in dispute is incorrect. *See In re Resyn Corp. v. United States*, 851 F.2d 660, 663 (3rd Cir.1988); and *Psaty v. United States*, 442 F.2d 1154, 1158–59 (3rd Cir. 1971).

Federal courts addressing the issue of allocation of the burden in tax disputes occurring in the context of bankruptcy claims litigation have differed in their conclusions. Some courts have held that the burden of proof established in tax litigation outside of bankruptcy is also applicable to tax disputes arising in a bankruptcy case. *See, e.g., Resyn, supra*, 851 F.2d at 663–64; *In re Uneco, Inc.*, 532 F.2d 1204, 1207 (8th Cir.1976); and *In re Cobb*, 135 B.R. 640 (Bankr.D.Neb.1992). However, a substantial number of courts, apparently a majority, addressing the issue have decided that the general bankruptcy-claims-litigation allocation of burden of proof is applicable to the IRS; thus, a claim of the IRS, like any other claim, is accorded a *prima facie* evidentiary effect only until the objecting party produces sufficient evidence to rebut the presumption, whereupon the burden of persuasion reverts to the IRS. *See, e.g., Fidelity Holding Co., Ltd. v. Official Creditors Committee*, 837 F.2d 696, 698 (5th Cir.1988); *Internal Revenue Service v. Levy*, 130 B.R. 28, 32 (E.D.Va.1991); *In re Gran*, 131 B.R. 843, 846 n. 1 (E.D.Ark. 1991), *aff'd*, 964 F.2d 822 (6th Cir.1992); *In re Federated Dep't Stores, Inc.*, 135 B.R. 950, 957–58 (Bankr.S.D.Ohio 1992); and *In re Dakota Industries, Inc.*, 131 B.R. 437, 444 (Bankr.D.S.D.1991). In *Premo, supra*, 116 B.R. at 518–24, the court conducted an in-depth survey and analysis of these and many other decisions and concluded, *id.* at 524, as follows:

no reported decision to which we were referred, or which we located on our own, satisfactorily explains why either party in this case should bear the burden of proof in the trial of bankruptcy claim objection....

... We therefore decline to recognize an exception to the well-established rule allocating to the creditor the ultimate burden of persuasion in a trial of an objection to a claim.

In this Circuit, we are, of course, controlled by *Resyn*, in which the court states, 851 F.2d at 663, as follows, in the context of an objection to a claim of the IRS in a bankruptcy case:

The burden of proving that an assessment is arbitrary and excessive rests upon the taxpayer; if the taxpayer cannot prove that the assessment was arbitrary, it retains the burden of overcoming the presumption in favor of the government that the assessment was not erroneous....

However, once the taxpayer has sustained its burden of proving that the

assessment is arbitrary and excessive, *i.e.*, that it lacks a rational foundation in fact and is based upon unsupported assertions, the ultimate burden of proving that the assessment is indeed correct is placed on the government....

As *Premo* points out, 116 B.R. at 520 n. 11, our own decision that the IRS bore the burden of proof in an objection to a claim in *In re Motor Freight Express*, 1988 WL 47601, at *3 (Bankr.E.D.Pa.1988), preceded the *Resyn* decision, and was succeeded by two of our decisions post-*Resyn* holding that the taxpayer bears the burden in such litigation. *In re Williams*, 1990 WL 10347, at *5 (Bankr.E.D.Pa.1990); and *Green, supra*, 89 B.R. at 474.

We do not believe that the *Resyn* court meant to lay down a broad directive that the burden of proof never lies upon the IRS in a tax-claim dispute. The *Resyn* court never discusses the potential conflict of its conclusions regarding the burden of proof with the rules of law involving the burden of proof of bankruptcy claims, which it later articulated with great clarity in *Allegheny Int'l*, as quoted at pages 144–45 *supra*. The rule regarding the placing of the burden of proof on the taxpayer in tax cases generally presumably arises from the superior access which a taxpayer has to its own records and knowledge of its own affairs, relative to that of the IRS. *See, e.g., In re Fricker*, 116 B.R. 431, 437–38 (Bankr. E.D.Pa.1990) (party with the superior access to the means of proof generally bears the burden of proof). This policy evaporates if someone other than the taxpayer, *e.g.*, a trustee or another creditor, is pressing the objection. Also driving the allocation of the burden is the assumption that the taxpayer wishes to avoid paying taxes to serve its own economic self-interest. While the Debtor-taxpayer is the party challenging the instant assessment, it is doing so in its role as a debtor-in-possession, in which it is placed in the role of a fiduciary for all of the Debtor's creditors. Therefore, self-interest, while present, is muted somewhat from that of the ordinary taxpayer and involves the interests of third parties who are not parties to the immediate dispute.

By its very terms, the quoted language regarding the burden of proof in *Resyn* states that, only where a taxpayer is obliged to prove that the IRS was both "arbitrary and excessive" in making an assessment to challenge its claim, does the burden falls initially upon the taxpayer to do so. It is not clear to us that a taxpayer need always prove that an assessment is arbitrary to obtain relief from it as excessive. Clearly, *Resyn* holds that, if the assessment is proven "arbitrary and excessive," the burden of proving the correct assessment lies on the IRS. It would seem to us that, if the taxpayer presents evidence that an assessment is excessive alone, the burden should fall upon the IRS to prove its claim's accuracy.

A recent case which we found helpful in our general analysis, as an analogous contest over whether a debtor's workers were properly classifiable as independent contractors or employees, is *In re Rasbury*, 130 B.R. 990 (Bankr.N.D.Ala.1991) ("*Rasbury I*"), *aff'd*, 141 B.R. 752 (N.D.Ala. 1992) ("*Rasbury II*"). Both *Rasbury* courts conclude that the burden of proving that a worker classified as an independent contractor is in fact an employee fell upon the IRS, *Rasbury II*, 141 B.R. at 758; and *Rasbury I*, 130 B.R. at 1001–03, but that the burden of proving the applicability of Section 530 rested with the debtor-taxpayer. *Rasbury II*, 141 B.R. at 758; and *Rasbury I*, 130 B.R. at 1003–04.

This allocation of the burden of proof seems logical to us. Nevertheless, we acknowledge that the Debtor here takes the position that it bears the burden on both the classification issue and the Section 530 issue.

Perhaps this concession on the part of the Debtor is an acknowledgement that, irrespective of how the burden is allocated on the classification issue, the Debtor's position on this issue cannot be sustained on the instant record. Our analysis, drawing on comparisons with the *Rasbury* case, in which the debtor-taxpayer succeeded on this issue, clearly bore this out.

■ The only close issue presented in this contested matter is the Section 530 issue. We agree with *Rasbury* that the Debtor bears the burden of proof on this issue, since it is seeking a personalized dispensation from normal treatment. *Accord, In re McAtee,* 115 B.R. 180, 182 (N.D.Iowa 1990). Since it is clear that the Debtor bears the burden on this decisive issue, the allocation of the burden on the classification issue and the other issues in the case recede in importance. We wish to make clear, however, that we do not read *Resyn* so broadly as to remove the burden of proof from the IRS in all tax-related claims litigation.

## 2. THE WORKERS AT ISSUE MUST BE CLASSIFIED AS INDEPENDENT CONTRACTORS AND NOT AS EMPLOYEES UNDER THE INTERNAL REVENUE CODE.

■ Pursuant to 11 U.S.C. § 505, a bankruptcy court has the authority to determine the legality of a tax assessed against a debtor. *Quattrone Accountants, Inc. v. Internal Revenue Service,* 895 F.2d 921, 925–26 (3d Cir.1990). In the instant matter, the Debtor has, principally, requested that we deny the claim of the IRS on the ground that the taxes it assessed against the Debtor are invalid because they arise from an incorrect reclassification of Debtor's independent contractors as employees.

Under the Internal Revenue Code, 26 U.S.C. § 101 *et seq.* (1992) ("the IRC"), an employer is required to withhold from an employee's paycheck an amount equal to that portion of personal income taxes and social security taxes ("FICA") owed to the Government by its employees. 26 U.S.C. §§ 3101, 3102(a), 3402(a). An employer is also required, itself, to pay one-half of the FICA taxes assessed upon an employee's wages. In addition to FICA taxes, the employer must pay federal unemployment taxes ("FUTA") for its employees. 26 U.S.C. § 3101.

An employer's liability for payment of these taxes exists only if the person(s) it engages for work are employee(s). If the individuals are independent contractors and not employees, then the employer is not required to withhold or pay FICA and FUTA taxes. Accordingly, in order to find the employer responsible for payment of those taxes, the workers must be found to be employees.

In the instant proceeding, the Debtor is liable for the assessed taxes only if we find that the workers in question were employees. A determination of the status of Debtor's workers as "independent contractors" versus "employees" requires this court to collect and review the pertinent provisions of the IRC, IRS rulings, and case law on this issue.

■ The IRC provides that an employee for FICA and FUTA taxes purposes means "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee; ...." 26 U.S.C. § 3121(d)(2) (1992). Generally speaking, if an employer has significant control over the worker, the worker is deemed an employee. To the extent that an employer exercises minimum, if any, control over the worker, the worker is classified as an independent contractor for tax purposes. *See* 26 C.F.R. § 31.3121(d)–1 (1992); and *In re St. Joseph's Hospital,* 126 B.R. 37, 41–42 (Bankr.E.D.Pa.1991). The parties agree that, under the common law rules analysis, twenty (20) factors are usually applied to evaluate the relationship of the employer and the worker and determine the extent to which the employer exercises control and authority over the worker.

We have already noted that we found *Rasbury* to be a closely-analogous recent case. In *Rasbury,* the IRS filed a claim for FICA and FUTA taxes against Chapter 11 debtors, a logging contractor and its principal. The IRS' tax claim was based upon its reclassification of the debtor-contractor's workers from independent contractors to employees.

The workers were crew members performing logging work in Alabama. The debtor-contractor operated pursuant to contracts with forest products companies to supply logs and remove timber from their

land. The debtor argued that the workers were independent contractors because they provided some of the trucks, hand tools and safety equipment. *Rasbury I, supra,* 130 B.R. at 993, 999. The debtor further argued that the workers were independent contractors because they were paid on a production basis. *Id.* at 994. The IRS countered that an employer/employee relationship existed because the workers were (1) supervised by the Debtor, (2) supplied tools, (3) hired and fired at will, (4) paid by the day, and (5) instructed on when and where to work.

The *Rasbury* courts refused the invitation of the IRS and the debtor to decide the broad issue of what was apparently a long-standing nationwide conflict between the IRS and the forest products industry regarding classification of workers. Rather, the *Rasbury I* court found that a determination of the workers' status must be based upon the particular facts of the case before it. 130 B.R. at 998–99. In so doing, the court applied the twenty (20)-factor test, adding four additional factors which it found made its analysis more representative to the relevant facts, and determined that the logging crew members were independent contractors. Consequently, the court sustained the debtor's objection to the IRS' claim.

The Debtor in the instant matter, like that in *Rasbury,* argues that its workers are independent contractors because *inter alia* the workers were (1) engaged to perform specific jobs on an as needed basis, (2) not supervised by the Debtor, (3) provided their own tools and supplies, (4) decided when to work, and (5) issued IRS Form 1099's. The IRS counters that the evidence, on the contrary, indicates that the workers were employees. The IRS' conclusion is based upon its determination that the workers were (1) subject to the control and direction of the Debtor, (2) paid on a daily or hourly rate and not by the job, (3) reimbursed for expenses, (4) engaged for extended periods of time, and (5) free to quit at any time and did not work pursuant to any contract.

At the time of trial on this matter, both parties offered testimony supporting their analysis of the facts under the twenty (20)-factor test. We find that the evidence presented established rather clearly that, under the twenty (20)-factor test and considering the four factors added by the *Rasbury* courts, the workers whose classifications were in dispute were improperly classified as independent contractors. The following comparison of the analysis of the twenty-four (24) factors considered in *Rasbury I* with the facts which were established occurred in the matter *sub judice* will explain the basis for our decision.

1. *Instructions:* Logging workers are an independent breed, historically determining when and how they will work. Mr. Rasbury assigned workers to a tract—but the crews set their own time of work and chose their own method to remove the timber. *Rasbury I,* 130 B.R. at 1005.

Since the Debtor's workers were highly skilled individuals, they were not provided with many instructions on how to conduct their duties. They were, however, instructed on when and where to work. Further, none of the workers determined when or how they would work. Rather, the afloat workers worked when the Debtor determined that the boats were ready to sail. Similarly, the ashore workers performed when, per the Debtor's directions, the boats were in the dock or not being operated in the waters.

2. *Training:* There is no specific training for logging workers. Such workers train on the job to develop a high degree of skill in cutting, bunching, loading and transporting logs to the mill. *Id.*

The evidence indicates that the Debtor's independent contractors, like its employees, were skilled workers who acquired their skills prior to their association with the Debtor. Further, the positions of captain, mate, engineer, and deckhand all required Coast Guard certifications. These were obtained by attending specified courses and passing Coast Guard tests. Hence, no training of either the contractors or the employees was generally required.

3. *Integration:* Only the end result of crew members' services—delivery of the logs that fulfilled his contracts—were integrated into Rasbury's business. *Id.*

The independent contractors were fully integrated into the Debtor's business. The Debtor could not operate its boats without the workers.

4. *Services Rendered Personally:* Workers cooperate as a team to achieve the greatest productivity since individual team members are paid on a per-ton basis. *Id.*

Bates testified that independent contractors were hired for their *particular* skill or qualifications. Individuals were *not* paid on a production basis which they shared with other "team" members.

5. *Hiring, Supervising and Paying Assistants:* This factor cannot be fully applied in this context since crew members did not have control of Bill's Forestry [Rasbury's business] assets. However, crew members did testify that they hired other crew members and terminated those who let the team down. *Id.*

There was no evidence that any of the Debtor's independent contractors had the authority or need to hire assistants. Bates testified that workers were hired on the basis of their individual skills. None of the independent contractors had the authority to terminate fellow workers.

6. *Continuing Relationship:* It is common for logging crew members to have a long-standing relationship with one logging contractor. But it is also common for workers to leave one contractor and go to another producer, or to work for more than one contractor at a time. *Id.* at 1005–06.

The IRS' evidence demonstrated that most of its independent contractors had long-term relationships with the Debtor. One contractor worked for the Debtor as such for 36 consecutive months. Further, an overwhelming majority of the contractor witnesses stated that they worked exclusively for the Debtor during their period of employ.

7. *Set Hours of Work:* Mr. Rasbury did not set hours of work. Normally, the team decided when it would start work, when it would finish. The schedule was flexible depending on the number of tons the team wished to produce. *Id.* at 1006.

Bates, Anderson, and the contractor witnesses testified that there are no set working hours in the tugboat towing industry. Therefore, work schedules were not determined by the independent contractors. Instead, the tugboat crew worked when the boat travelled. The owners of the Debtor determined when and where the boats travelled. The mechanics performed their repairs when the boats were available. Availability was, however, due to the actions of the Debtor, not the workers.

8. *Full Time Required:* The crew members, part of a team concept, had to work as the team chose to achieve maximum production. However, when the team was not working, crew members were free to work for others, particularly on weekends. *Id.*

The evidence indicates that the marine towing industry does not operate on an eight-hour, five-day work week, as apparently does the logging industry. Rather, the working day for afloat workers usually ran for periods of twelve hours, and working days tended to be consecutive for as long as the boat was in service, rather than allowing time off for weekends. However, the witnesses and the IRS records indicated that the work supplied by the Debtor to its independent contractors was sufficient to cause most of them to work full-time for the Debtor.

9. *Doing Work on Employer's Premises:* All of the Bill's Forestry work was on tracts assigned by various mills. *Id.*

Most of the work performed by the contractors was on the Debtor's premises (ashore contractors worked on the boats and docks in the Debtor's dockyard) or property (afloat contractors worked upon the Debtor's boats).

10. *Order or Sequence (of tasks) Set:* Cutters, skidders, loaders and truck drivers set the sequence to achieve one result, to be paid based on a per-ton computation. *Id.*

Both the tugboat contractors and employees were skilled and often licensed workers who performed their duties without the direct supervision of the Debtor. However, the different jobs on which the contractors worked was established solely by the Debtor. Compensation was not made on a basis related to the income derived from the job, but by the time expended by the worker on the job.

11. *Oral or Written Reports:* None were required. *Id.*

Certain of the Debtor's workers, particularly captains and, to a limited extent, engineers, were required to keep logs and records for the Debtor. However, these duties were required of contractors and employees alike.

12. *Payment by Hour, Week or Month:* The team (consisting of cutters, skidders, loaders and truck drivers) were paid by the ton for log production work, an important indication of independent contractor status. Basing compensation on production increases the economic efficiency of business, as Mr. Rasbury told the court. He also testified that production has gone down since he yielded to IRS and reclassified his workers as hourly employees. *Id.*

Bates and the contractor witnesses testified that the tugboat workers were paid by the day and the mechanics by the hour. The contractors were not paid based upon production or by the job. They were paid like *employees* in the logging industry.

13. *Payment of Business and/or Travel Expenses:* None of the workers were paid expenses of any kind, another indicator of an independent contractor relationship. *Id.*

Armbruster and Federico testified that the Debtor reimbursed both the independent contractors as it did employees for traveling expenses, and provided food during a boat's travels for all workers.

14. *Furnishing of Tools and Materials:* Rasbury and Bill's Forestry furnished the heavy equipment. However, some of the truck drivers brought their own trucks. Other crew members furnished their own saws, hardhats and other safety equipment. *Id.*

The Debtor furnished all of the heavy tools and navigational equipment for both its contractors and its employees. Both the contractors and employees, if they so desired, used their own personal hand tools and navigational equipment.

15. *Significant Investment:* Crew members who supplied their own trucks, chain saws, safety gear or other equipment should be viewed as having a significant investment. *Id.*

There was no evidence that the Debtor's independent contractors made any significant investment in their equipment. Although the contractors did have personal tools, the values of these items were not proven to be substantial.

16. *Realization of Profit or Loss:* Since the crew members were paid by the ton and no expenses [were] paid, their realization of profit would depend on the volume of timber cut and removed against expenses. *Id.*

Since the Debtor's independent contractors were paid by the day or hour and not by the job, their realization of profit did *not* depend upon output or production.

17. *Working for More than One Firm at a Time:* Crew members could and did work for more than one firm at a time. *Id.*

The evidence indicates that the Debtor's contractors worked exclusively or almost exclusively for the Debtor during the period of their engagements by the Debtor.

18. *Making Service Available to the General Public:* Workers advertise their skills to logging producer firms through word of mouth. *Id.*

Although the Debtor submitted a business card of one person who provided services as a captain, there was no evidence that contractors engaged by the Debtor widely advertised their skills or sought work with other tugboat companies.

19. *Right to Discharge:* Since the team was paid on a per-ton basis, the team did, in effect, discharge workers if they were not pulling their share of the load.

There was testimony that Mr. Rasbury, on occasion, did hire and fire some workers. *Id.*

20. *Right to Terminate:* Each crew member had a right to terminate his relationship with Bill's Forestry at any time, an indicator of an employer/employee relationship. *Id.*

The Debtor had and exercised the sole right to discharge either a contractor or employee if he did not perform his job. Further, each contractor had a right to terminate his relationship with the Debtor at any time. However, there is no evidence that any crew member, including even a captain, had the power and right to discharge another worker on his own.

21. *Industry Practice or Custom:* It was the widespread, almost universal, custom to classify such workers as independent contractors in the West Alabama logging industry in the 1980s.... *Id.*

Anderson's and Gilbert's testimony indicated that it was not a universal practice in the tugboat towing industry to classify workers who remained with a particular employer for any appreciable length of time as independent contractors. Anderson stated that such classification occurred only when a worker was engaged for one to two days or on a very limited basis. The Debtor engaged contractors for much longer periods of time.

22. *Intent of the Parties—How They Viewed the Relationship:* It is plain from the evidence that most crew members and Rasbury intended to create an independent contractor relationship. *Id.* at 1007.

The evidence offered tended to prove that the contractors were often somewhat surprised at the Debtor's practice of treating them as independent contractors for lengthy periods of time. Moreover, the evidence suggests that the workers were hired as contractors as a prerequisite for becoming employees. The contractor status was utilized by the Debtor as a method for evaluating workers' skills as prospective employees.

23. *Written, Signed Independent Contractor Agreements:* All of the parties employed as crew members by Bill's Forestry signed written agreements designating themselves as independent contractors. Further, ninety-four (94) percent of them, after the fact, signed forms 4669 attesting they had paid their own taxes on the money paid them by Bill's Forestry. *Id.*

None of the parties employed by the Debtor signed written agreements designating themselves as independent contractors. Further, the evidence indicated that the independent contractor status served as a probation period for potential employees. The workers in question who testified claimed that they ultimately paid their own taxes, but there is some indication that many paid only when pressed by the IRS after the fact of initial non-payment.

24. *Employee-type Benefits Provided?:* Benefits indicating employee status include paid vacation, sick leave, medical insurance, pension accrual, etc. With the exception of a limited Workman's Compensation Insurance Program, Bill's Forestry provided crew members with no employee-type benefits.... *Id.*

The Debtor provided benefits to employees, but not to contractors. This is the one area in which there was a significant difference in treatment of the two groups of workers.

Although none of the above-discussed factors is controlling, these factors, when taken as a whole, overwhelmingly suggest that the independent contractors were in fact employees. Firstly, the evidence suggests that the Debtor had the right to control and direct independent contractors on when and where to work and did so in precisely the same fashion as it did its employees. The afloat workers were required to work upon the boats designated and at the time periods specified by the Debtor. The contractors could not determine when and where their work would be performed. Further, the ashore workers were given direction as to which boats to repair and the order in which the repairs were to be performed. These facts are in stark contrast to the practices in the logging industry.

Secondly, the Debtor maintained a continuous and exclusive relationship with many of its contractors. The testimony of Beach, Armbruster, and Creed revealed that the independent contractors worked on an exclusive and full time basis for the Debtor. Further, following a short time period, a good worker was converted to employee status.

Thirdly, there was no team concept or piecework payment schedule or control over workers by other workers, as in the logging industry.

Fourthly, the independent contractors were fully integrated into the Debtor's business. The Debtor's business could not operate without the tugboat workers who operated the boats and the mechanics who insured that the boats remained functional.

With the exception of the final, 24th test added to the list of factors by the *Rasbury* court, and the absence of training (Factor 2), we find that none of the factors cut in the Debtor's favor. The Debtor's futile attempts to distinguish the duties of contractors and employees, unsupported by many of its own witnesses, served to do little but undermine the credibility of witnesses such as Bates. Assuming *arguendo* that the IRS had the burden of proving that the disputed workers were employees rather than independent contractors, it indisputably did so. The comparisons to the debtor's successful case in *Rasbury* merely served to heighten the weaknesses in the instant Debtor's case.

Therefore, we find that, under the common law tests, the contractors were employees of the Debtor and, as such, were subject to FICA and FUTA taxes unless the Debtor could meet its burden of proving that it fell within the "safe harbor" (an appropriate metaphor in this case) of Section 530.

3. THE DEBTOR FAILED TO PROVE THAT IT MET THE REQUIREMENTS FOR RELIEF UNDER SECTION 530.

■ Although we have determined that the Debtor's workers were employees subject to FICA and FUTA taxes, the Debtor

could escape liability for payment of these taxes if it qualified for the protection afforded by Section 530. Section 530 was enacted by Congress

in reaction to what Congress perceived as an overzealous initiative by the Internal Revenue Service against employers it deemed to have misclassified workers as independent contractors. Congress intended the section to serve as a temporary respite sheltering those who had acted in good faith from catastrophic retroactive liability.

. . . . .

While some variations can be read into the meaning of the words of the statute, the intent of Congress, in 1978 and up to 1991, seems clear. Although Congress wished taxes withheld properly and properly collected by IRS, it did not wish the "twenty common law factors" to be applied so subjectively that hardship resulted for businesses which had acted in good faith.

*Rasbury I, supra,* 130 B.R. at 1010. *Accord, Darrell Harris, Inc. v. United States,* 770 F.Supp. 1492, 1498 (W.D.Okla.1991).

Section 530 provides in pertinent part:

(a) Termination of certain employment tax liability.—

(1) In general.—If—

(A) for purposes of employment taxes, the taxpayer did not treat an individual as an employee for any period, and

(B) in the case of periods after December 31, 1978, all Federal tax returns (including information returns) required to be filed by the taxpayer with respect to such individual for such period are filed on a basis consistent with the taxpayer's treatment of such individual as to being an employee, then for purposes of applying such taxes for such period with respect to the taxpayer, the individual shall be deemed not to be an employee unless the taxpayer had no reasonable basis for not treating such individual as an employee.

(2) Statutory standards providing one method of satisfying the requirements of paragraph (1).—For purposes of paragraph (1), a taxpayer shall in any case be treated as having a reasonable basis for not treating an individual as an employee for a period if the taxpayer's treatment of such individual for such period was in reasonable reliance on any of the following:

(A) judicial precedent, published rulings, technical advice with respect to the taxpayer, or a letter ruling to the taxpayer.

(B) a past Internal Revenue Service audit of the taxpayer in which there was no assessment attributable to the treatment (for employment tax purposes) of the individuals holding positions substantially similar to the position held by this individual; or

(C) long standing recognized practice of a significant segment of the industry in which such individual was engaged.

(3) Consistency required in the case of prior tax treatment.—Paragraph (1) shall not apply with respect to the treatment of any individual for employment tax purposes for any period ending after December 31, 1978, if the taxpayer (or a predecessor) has treated any individual holding a substantially similar position as an employee for purposes of the employment taxes for any period beginning after December 31, 1977....

26 U.S.C. § 3401 Note (1992).

█ Under these provisions, a taxpayer qualifies for Section 530 protection if (1) all federal tax returns (including information returns) required to be filed by the taxpayer with respect to the individual for the period are filed on a basis consistent with the taxpayer's treatment of the individual as not being an employee ("reporting consistency rule"); (2) the taxpayer has not treated any individual holding a substantially similar position as an employee for purposes of employment taxes for periods beginning after December 31, 1977 ("substantial consistency rule"); and (3) the tax-

payer had a reasonable basis for not treating the worker as an employee. Rev.Rul. 87–41. *See In re Critical Care Support Services, Inc.*, 138 B.R. 378, 380 (Bankr. E.D.N.Y.1992). The statute then recites three non-exclusive means by which a taxpayer can prove that it had a reasonable basis for its treatment of the workers as independent contractors.

The Debtor asserts that it meets the Section 530 requirements and is entitled to its protection for several reasons. Firstly, Debtor contends that it both treated all of the contractors as such on a consistent basis and filed the required federal tax returns on a basis consistent with treatment of the workers as independent contractors. Secondly, the Debtor claims that it reasonably relied upon industry standard, judicial precedent, and the advice of its labor counsel for treating the workers as independent contractors. Thirdly, Debtor states it did not treat any person holding a position similar to the independent contractor as an employee.

The IRS maintains that the Debtor is not entitled to Section 530 protection because Debtor did not (1) consistently treat the workers as contractors for the entire period of their employment with the Debtor, and instead, in many instances, converted the workers doing the same jobs from contractor to employee status; (2) timely file the required tax return from 1984 to 1986, resulting in undisputed tax liability, nor provide Form 1099's to the workers, as required if they maintained independent contractor status; nor (3) have a reasonable basis for classifying workers as contractors, since it treated workers doing the same jobs and, hence, holding the same positions as the contractors, as employees.

We find that the Debtor has failed to make a strong showing of any of the specific elements set forth in Section 530, and that it is not entitled to Section 530 protection because it failed to prove that it had a "reasonable basis" for treating the workers as independent contractors. *See Spicer Accounting, Inc. v. United States*, 918 F.2d 90 (9th Cir.1990); and *Lambert's*

*Nursery & Landscaping, Inc. v. United States,* 894 F.2d 154 (5th Cir.1990).

As discussed above at page 153 *supra,* Section 530(a)(2) provides three specific circumstances which automatically satisfy the requirement of establishing a "reasonable basis per se." Although the Debtor argues that its decision to treat the workers as contractors is within the ambit of these "safe harbors," the evidence does not support any such findings. Firstly, the Debtor's evidence on industry practice was unpersuasive. The testimony of Debtor's expert Anderson suggests that it was *not* an industry practice to treat workers such as those engaged by the Debtor as independent contractors. Rather, it appears that the practice in the marine towing industry was to treat as contractors individuals who worked for only short periods of time for that employer, *i.e.,* one or two days.

Secondly, the Debtor's assertion that it relied upon the advice of its labor counsel that the workers were independent contractors for purpose of voting on the decision to unionize does not qualify under Section 530(a)(2)(A). Courts addressing the issue have held that the legal advice must be provided by a person familiar with employment taxation and that sufficient information must be provided as a basis for the advice. *See McAtee, supra,* 115 B.R. at 184–185. *Cf. Henderson v. United States,* 1992 WL 104326, at *3 (February 18, 1992 W.D.Mich.1992) (technical advice in Section 503(a)(2)(A) refers only to IRS rulings or treatment). Here, the advice came during the course of a labor dispute in 1985, three years after the Debtor first began treating employees as contractors. There is insufficient evidence that this alleged advice played any role in the Debtor's actual decision to proceed to classify workers as it did.

Finally, the Debtor has not identified any judicial precedent on which it relied in classifying its workers.

■ Although the Debtor has not satisfied any of the "reasonable basis *per se* " provisions of § 530(a)(2), its right to qualify for the "reasonable basis" exception on another ground is not precluded. The "reasonable basis" exception is to be "liberally" interpreted and can be proven by making other comparable showings by the taxpayer of a reasonable basis for its classification of workers. *See* H.R.REP. NO. 1445, 95th Cong., 2d Sess., at 5 (1978), U.S.Code Cong. & Admin.News 1978, pp. 6761, 7048; *Critical Care Register Nursing, Inc. v. United States,* 776 F.Supp. 1025, 1027–29 (E.D.Pa.1991); and *Darrell Harris, supra,* 770 F.Supp. at 1498.

While the taxpayer is entitled to Section 530 protection if it has a "reasonable basis" for classifying its workers as independent contractors, the statute does not define "reasonable basis." Therefore, we look to the legislative history of the statute for aid in determining the meaning of that phrase. A review of relevant legislative materials suggests that Section 530 was intended to prohibit the reclassification of workers "whom the taxpayer consistently has treated in good faith as independent contractors." S.REP. NO. 1263, 95th Cong., 2d Sess., at 210 (1978). Further,

a taxpayer will not be considered to have acted in good faith if his treatment of individuals as independent contractors would on the basis of the pertinent facts and circumstances, constitute negligence, intentional disregard of rules and regulation, or fraud within the meaning of section 6653 of the Code.

*Id.* at 211.

■ Under the standards articulated in the Senate report, Debtor has a "reasonable basis" for Section 530 protection if he acted in "good faith." In *Darrell Harris, supra,* the court discussed the issue of "good faith" and "reasonable basis" under Section 530. There, the court found that a taxpayer who asserted that it had classified its sole worker as independent contractor because of cash flow problems did not have a Section 530 "reasonable basis" for such classification. Rather, the court found that the evidence, which established that, instead of the taxpayer's paying the contractor a fixed salary, it commingled the contractor's personal bills with its own and paid personal bills through salary advances, proved that the taxpayer had not

acted in "good faith" and, as such, its rationale for the independent contractor treatment of its worker was not a "reasonable basis." 770 F.Supp. at 1497.

■ Similarly, the rationale presented by the Debtor for its classification of the workers as independent contractors does not withstand a "good faith" test. The Debtor has asserted that the workers were not treated as employees because it could not guarantee a 40 hour work week and the workers were only engaged to fulfill an unanticipated and temporary need. This allegation is contrary to the evidence, which demonstrates that the independent contractors worked substantially full time and for extended and continuous time periods.

More important, however, is the fact that the workers were classified as contractors for a specific time period, normally three to four months, and then reclassified as employees. This pattern severely undermines Bates' explanation of the basis for his treatment of the workers as contractors. Rather, it appears that the Debtor hired workers as contractors to provide it with a probationary period to determine whether it wished to hire these workers as employees. Bates failed to concede that this was the Debtor's policy and therefore never presented the issue of whether such a practice could be considered as a "good faith" scheme of classification. The failure of Bates to admit that this practice was its classification scheme suggests that he does not believe that such a scheme would qualify as a "reasonable basis" for its classification methodology under Section 530(a)(1)(B). Since the articulated "reasonable basis" for its actions is not substantiated by the evidence, we conclude that the Debtor is not entitled to the "reasonable basis" defense under Section 530(a)(1)(B).

This conclusion is further supported by our observation that courts attempting to define the term "reasonable basis" have placed particular emphasis on the issue of the taxpayer's control over the workers in question in determining whether a ground for finding a "reasonable basis" for the taxpayer's actions existed. For example,

in *Critical Care Register, supra,* 776 F.Supp. at 1028, the district court instructed the jury on two issues:

whether a worker is an employee or independent contractor, of which the most important is the right to control, ... [and] whether [the employer], in not treating its nurses as employee, had reasonably relied on a long-standing recognized practice of a significant segment of the industry in which the nurses were engaged.

*Cf. St. Joseph's Hospital, supra,* 126 B.R. at 41–42 (the degree of the employer's control over the worker by the employer is the most important factor in determining whether a worker is an "employee").

Accordingly, in this proceeding the most important touchstone for the Debtor in establishing a "reasonable basis" for its classification would be proof that it did not have the right to control or direct the independent contractor workers. The evidence presented at trial indicates that the Debtor *had* the right to control and direct the independent contractors. Since the workers were skilled laborers, it was unnecessary for the Debtor to control their every movement once the workers arrived for work. The Debtor did, however, retain the right to assign an afloat contractor to any particular boat or to direct an ashore contractor as to when and where to repair its engine or boat. *Compare Critical Care Support Services, supra,* 138 B.R. at 382 (debtor who supplied nurses to area hospitals had no reasonable basis to treat nurses as independent contractors because it retained the right to control their work assignments). As already was noted, no long-standing recognized industry practice was established by the Debtor, either.

It is somewhat disturbing to us to observe the selective enforcement of the IRC requirements for classification of employees, which Gilbert himself conceded in his admission that his own wife was probably improperly classified by her employer. We also were disturbed by the suggestion that Gilbert prides himself as somewhat of a crusader on this issue. It is perhaps in recognition of the harshness of enforce-

ment of these IRC requirements on the unfortunate targets of IRS enforcement that Congress has enacted Section 530 as an "out" for certain employers.

However, the Section 530 exceptions apply in only certain circumstances. The facts here simply do not appear to fit the circumstances set out in Section 530. We observe two elements of the instant facts which cut strongly against the Debtor: (1) the classification scheme utilized by the Debtor effected a substantial loss of tax dollars to the IRS; and (2) Bates presented himself as an unusually well-educated, sophisticated individual, much more so than one would normally anticipate in the principal of a tugboat company. We find it difficult to believe that Bates was unaware of the impact of the Debtor's classification scheme upon the IRS and the Debtor, to the former's disadvantage and the latter's advantage. We cannot believe that the classification scheme was devised innocently. This conclusion is supported by the hollowness of the rationale articulated by Bates for the distinction between contractors and employees. We therefore have great difficulty in finding a good faith, reasonable basis for the Debtor's actions at any level.

In addition to finding that Debtor had no "reasonable basis" for treating the workers as independent contractors, we find that the Debtor is not entitled to Section 530 protection because it made a weak showing of the other pertinent elements. A strong argument can be made that the Debtor failed the consistency requirement of Section 530(a)(3) because it *did* treat individuals "holding a substantially similar position" to those of contractors "as an employee." The evidence presented by both the Debtor and IRS established that the jobs performed by the independent contractors and the employees were basically the same, and that any differences in duties were *de minimis*. For example, the captain/pilot, both the independent contractor and employee, was responsible for navigating and controlling the boat. In addition, both contractors and employees were required to submit to the Debtor reports containing the name of the persons work-

ing on the boat for payroll purposes. Similarly, the engineer, both as contractor and as employee, was responsible for repairing the Debtor's engines and was directed by a supervisor/captain or the Debtor's officers on when and where to work. It must be noted that Section 530(a)(3) provides that consistency is *required,* and that a showing of lack of consistency eliminates the applicability of Section 530 entirely, irrespective of a strong showing of other elements. *See Lowen Corp. v. United States,* 785 F.Supp. 913, 916 (D.Kan.1992) (Section 530 relief denied as to workers treated as independent contracts "who has substantially similar positions as employees").

Also plausible is the IRS' argument that the Debtor failed to meet the necessary requirement of Section 530(a)(1)(A) that it "did not treat an individual as an employee for any period." The same workers who began as contractors were, in many instances, later "hired" and treated as employees. We do not deem this element decisive because Section 530(a)(1)(A) probably refers to constant interchanging of workers from contractor status to employee status and back to contractor status again, and differing classifications of the same individual in the same period. The evidence indicated that the Debtor typically changed the classification of an individual once, from contractor to employee when his "probationary period" had been successfully completed. Also, changing the classification of a worker who had been previously classified as an employee to that of contractor appears to be a more aggravated violation of Section 530(a)(1)(A) than vice-versa, as was typically the case in the Debtor's operations. However, there was evidence that, at his request, the Debtor briefly changed the status of Cellinesi from employee to contractor, probably to assist Cellinesi in minimizing his tax burden, and back to employee again. In sum, we find the Debtor's satisfaction of the Section 530(a)(1)(A) requirement to be doubtful.

Finally, the IRS has some basis for arguing that the first prong of Section 530(a)(1)(B) that "all federal tax returns ... consistent with the taxpayer's treat-

ment of such individual as to being an employee" must be filed was not satisfied because the Debtor did not file tax returns for FICA and FUTA taxes at all in 1984–86 and never gave its contractors the requisite Form 1099's. *Compare St. Joseph's Hospital,* 126 B.R. at 41 (provision of a Form 1099 to a worker is indicative of independent contractor status). This conduct of the Debtor was not consistent with treatment of the workers as bona fide contractors *or* as employees. It could be argued that Section 530(a)(1)(B) references only conduct directly inconsistent with the treatment of workers as contractors, *e.g.,* treating them as employees for certain purposes in the same period. However, we find that the Debtor has hardly made a strong showing, if it has made any showing at all, of this requisite element, either.

We therefore must conclude that the Debtor has fallen short of proving, by a preponderance of the evidence, that it meets all of the necessary requirements of Section 530. Therefore we must conclude that the Debtor cannot sustain its Objection to the $194,961.90 assessment of the IRS for re-classification of its workers designated as independent contractors to the status of employees.

4. THE IRS IS NOT ENTITLED TO INTEREST ON ITS CLAIM WHICH REPRESENTS POST–PETITION INTEREST CHARGES.

■ The Debtor, in its post-trial Reply Brief, further objects to the claimed interest portion ($18,024.75) of the IRS claim for unpaid 1985 and 1986 FICA and FUTA taxes, stipulated by the parties in the principal amount of $83,190.39, on the ground that this interest figure includes post-petition interest. It also correctly points out that any claimed penalties for this tax period were stipulated to as already having been paid at the trial. In reference to the interest claim, the Debtor argues that, under 11 U.S.C. § 502(b)(2), the IRS is prohibited from receiving post-petition interest on its pre-petition taxes because it represents "unmatured interest."

It was a generally accepted principle under pre-Code bankruptcy law that "interest [on a claim] stops running on the date of the filing of the petition" and is not allowable against a Debtor's estate unless the Debtor proves to be solvent. *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 246, 109 S.Ct. 1026, 1033, 103 L.Ed.2d 290 (1989); *Nicholas v. United States,* 384 U.S. 678, 682, 86 S.Ct. 1674, 1678, 16 L.Ed.2d 853 (1966); *Bruning v. United States,* 376 U.S. 358, 362, 84 S.Ct. 906, 908, 11 L.Ed.2d 772 (1964); *Sexton v. Dreyfus,* 219 U.S. 339, 344, 31 S.Ct. 256, 257, 55 L.Ed. 244 (1911); *In re Shaffer Furniture Co.,* 68 B.R. 827, 830 (Bankr. E.D.Pa.1987); and 3 COLLIER ON BANKRUPTCY, ¶ 502.02, at 502–33 (15th ed. 1992). This principle was also found applicable to unsecured tax claims in *New York v. Saper,* 336 U.S. 328, 69 S.Ct. 554, 93 L.Ed. 710 (1949); and *In re Becker's Motor Transportation, Inc.,* 632 F.2d 242, 248 (3rd Cir.1980), *cert. denied,* 450 U.S. 916, 101 S.Ct. 1358, 67 L.Ed.2d 341 (1981).

Section 502(b)(2) is said to acknowledge this "accepted proposition and general rule" that post-petition interest cannot be recovered from the Debtor's estate. *See In re Hanna,* 872 F.2d 829, 830 (8th Cir. 1989); *In re Newbury Cafe, Inc.,* 841 F.2d 20, 21–22 (1st Cir.1988); and 3 COLLIER, *supra,* ¶ 502.02, at 502–30. However, there is an exception to this general rule. The Supreme Court has held that, under § 506(b) of the Code, post-petition interest accrues upon a pre-petition debt which is oversecured. *See Ron Pair, supra,* 489 U.S. at 237, 109 S.Ct. at 1028.

In the instant case, the IRS claim is unsecured and, as such, it does not qualify for the *Ron Pair* exception. Therefore, Debtor is correct that, pursuant to § 502(b)(2), the IRS is prohibited recovering any amounts of interest which represent *post-petition interest* against the Debtor's estate.

In order to determine whether the IRS' claim contains any post-petition interest, we must carefully review the contents of the Claim. A review of the Claim revealed the following amounts were claimed as pre-

petition interest on the 1985 and 1986 taxes:

| TYPE OF TAX | TAX PERIOD | INTEREST TO PETITION DATE |
|---|---|---|
| WH/FICA | 4th QTR 1985 | $ 1,787.42 |
| WH/FICA | 2nd QTR 1986 | 873.77 |
| WH/FICA | 3rd QTR 1986 | 0.00 |
| WH/FICA | 4th QTR 1986 | 0.00 |
| FUTA | 1985 | 861.05 |
| FUTA | 1986 | 0.00 |
| TOTAL INTEREST | | $ 3,522.24 |

The interest claimed by IRS on the Claim clearly differs from the amount now sought by it from the Debtor, and thus appears to clearly include post-petition interest. The IRS is entitled to receive only the interest listed upon the Claim as pre-petition interest, and not the post-petition interest which it now seeks. Accordingly, it is entitled to recovery of interest for the 1985 and 1986 delinquent taxes in the amount of $3,522.44 only, and not $18,014.75.

5. CALCULATION OF THE IRS' VALID CLAIM AGAINST THE DEBTOR.

We have determined that the Claim, including the disputed portion for reclassification of the Debtor's workers, is valid, but that the IRS is restricted to interest of $3,522.44 on its Claims for the 1985 and 1986 delinquencies. In addition to the $400,437.37 undisputed liability for unpaid 1984–86 FICA and FUTA taxes, which apparently has been or is being paid to the IRS through the Plan, we calculate the remaining valid disputed portion of the IRS' Claim as follows:

| TYPE OF TAX | TAX PERIOD | TAX AMOUNT | INTEREST TO PETITION DATE |
|---|---|---|---|
| WH/FICA | 1st Qtr. 1982 | $ 3,240.77 | $ 2,449.14 |
| WH/FICA | 2nd Qtr. 1982 | 2,330.61 | 1,581.41 |
| WH/FICA | 3rd Qtr. 1982 | 2,554.49 | 1,531.82 |
| WH/FICA | 4th Qtr. 1982 | 5,163.37 | 2,721.28 |
| WH/FICA | 1st Qtr. 1983 | 4,958.16 | 2,323.47 |
| WH/FICA | 2nd Qtr. 1983 | 8,163.47 | 3,404.24 |
| WH/FICA | 3rd Qtr. 1983 | 7,874.48 | 2,975.39 |
| WH/FICA | 4th Qtr. 1983 | 11,124.94 | 3,784.86 |
| WH/FICA | 1st Qtr. 1984 | 18,145.36 | 4,002.15 |
| WH/FICA | 2nd Qtr. 1984 | 10,586.94 | 2,850.71 |
| WH/FICA | 3rd Qtr. 1984 | 14,788.19 | 3,464.65 |
| WH/FICA | 4th Qtr. 1984 | 10,646.03 | 2,113.89 |
| FUTA | 1983 | 4,629.32 | 1,574.97 |
| FUTA | 1984 | 6,384.42 | 1,267.70 |
| FUTA | 1982 | 1,844.35 | 972.03 |
| Stipulated | 1985–1986 | 83,190.39 | 3,522.44 |
| TOTALS | | $195,625.29 | $40,540.15 |

## E. CONCLUSION

An order denying the Debtor's Objection to the IRS' Claim and allowing the Claim in the amount of $195,625.29 for taxes and $40,540.15 in interest, in addition to the $400,437.37 of undisputed liability, will be entered. We will also reschedule a status hearing in this case in light of our resolution of the only purported remaining matter in controversy.

## ON MOTION FOR RECONSIDERATION

## A. INTRODUCTION

On August 27, 1992, this court issued a lengthy Opinion (*"Compass I"*), and an Order denying, for the most part, the Objection of COMPASS MARINE CORPORATION ("the Debtor"), to the final, superseding claim (No. 42) of the Internal Revenue Service ("IRS") filed in this case for alleged unpaid federal withholding taxes ("FICA") and unemployment taxes ("FUTA") for the years 1982 through 1986.

The history of this litigation is related in *Compass I*, at 141–42. Therein, we noted that the proof of claim in issue ("the Claim") was filed on November 29, 1988, which was incidentally just two days before the established claims bar date in this bankruptcy case of December 1, 1988. *Id.* at 141. Although the Debtor's liquidating plan was confirmed on January 19, 1989, and the Debtor apparently intended to object to certain aspects of the Claim to reduce the liability to the IRS of the purchaser-successor of the Debtor's business, Christiana Marine Service Corp. ("Christiana"), somehow the Debtor never got around to doing so until after a Final Decree was entered and the case was closed on February 5, 1992. *Id.* at 142.

The Claim recites a total amount of $595,399.27, with the implication that unliquidated interest and penalties are to be added thereto, and the Claim expressly recites that all amounts recited therein relate to pre-petition arrearages. Equally as unequivocal as the Claim is the Debtor's prayer, in its Objection to the Claim of February 25, 1992, that it seeks to reduce $194,-961.90 from the Claim on the ground that the IRS improperly sought to reclassify its alleged independent contractors as employees. Hence, it seemed clear that $595,-399.27 less $194,961.90 of the Claim, or $400,437.37 of the Claim, was undisputed.

The parties engaged in a lengthy trial on June 18 and June 19, 1992, and thereafter in profuse briefing which was largely confined to the employee versus independent contractor issue. At no time prior to the issuance of *Compass I* did the IRS again seek to amend its Claim, as it had three times prior to filing the Claim. Nor did the Debtor ever seek to amend its Objection.

In *Compass I*, we ruled against the Debtor on the issue of whether its workers were properly classified as independent contractors. Therefore, we concluded that the taxes due were in fact $595,399.27, plus penalties and interest.

We allowed the IRS' claim for interest in the amount of $40,540.15, denying all but $3,522.44 of a request for certain disputed interest of $18,014.75, on the ground that the balance of this sum represented an impermissible claim for post-petition interest on pre-petition claims. *See* 11 U.S.C. § 502(b)(2); and *Compass I*, at 157–58. In addition, the IRS' claim for penalties was denied because the court found that the parties had stipulated, during the course of the trial, that any penalties due had been paid by the Debtor. *Id.* at 157.

On September 4, 1992, the IRS filed a Motion for Reconsideration of the Order of August 27, 1992 ("the IRS Motion"), pursuant to Federal Rule of Bankruptcy Procedure ("F.R.B.P.") 3008. The IRS alleges in its Motion that our decision denying the 1985 and 1986 penalties and limiting its interest claim for those tax years to $3,522.44, was erroneously based upon misrepresentations to the court by the Debtor. The IRS contended that it is entitled to the full amount of the penalties sought, in the amount of $6,671.40, because the stipulation in question did not apply to the disputed penalties. It also averred that it is

entitled to interest in the total amount of $55,032.46 (a difference of $14,492.32 from that awarded) because the Debtor allegedly agreed to same in the form of calculations which were intended to become, but which were in error not made, part of the record at the trial, and because the taxes for the last period on the Claim (October, 1986, through December, 1986) are post-petition taxes properly characterized as administrative expenses, upon which interest allegedly may properly accrue.

A hearing on the IRS Motion was scheduled on October 7, 1992. The Debtor filed an Answer to the Motion on October 6, 1992, stating that the IRS was entitled to the additional interest sought, but not to the penalties. At the request of both parties the hearing was re-listed on October 8, 1992. On the date of the hearing, the Debtor advised the court that it repudiated its Answer, contested all aspects of the IRS Motion, and had also filed its own Motion for Reconsideration of the Order of August 27, 1992, that day ("the Debtor's Motion"). The Debtor's Motion requested that the previously-undisputed tax liability in the amount of $400,437.37 be reduced to $350,279.66[1] because the court "mistakenly calculated" the "undisputed" tax amount. The Debtor also sought to have the court's Order regarding the "undisputed" amount altered slightly to include the year 1984, alleging a court oversight.

After argument on the Motions, the court entered an Order of October 9, 1992, permitting the parties to file simultaneous supplemental briefs supporting their respective positions regarding both Motions by October 15, 1992. The Debtor filed a short Brief, and the IRS submitted only a letter amending the transcript pages cited by its counsel at the October 8 hearing.

Both parties attempt to invoke F.R.B.P. 3008 in support of their respective Motions. That Rule provides that "[a] party in interest may move for reconsideration of an order allowing or disallowing a claim against the estate." The Rule operates in conjunction with 11 U.S.C. § 502(j), which states in relevant part that "[a] claim that has been allowed or disallowed may be reconsidered for cause. A reconsidered claim may be allowed or disallowed according to the equities of the case."

The Code does not define the terms "cause" or "equities of the case." In *In re Motor Freight Express*, 91 B.R. 705, 710–11 (Bankr.E.D.Pa.), *appeal dismissed*, 94 B.R. 346 (E.D.Pa.1988), we discussed at length the standards to be applied in determining "cause" and "equities of the case" and stated that

> the circumstances in which the application pursuant to B.Rule 3008 can be maintained should be construed broadly, and include "cause" and "equities" which would be grounds for relief under either F.R.Civ.P. 59 or 60(b). However, B.Rule 3008 must be applied in light of the strong contrary policy of encouraging prompt, final disposition of objections to proofs of claims. Therefore, some "cause" for reconsideration, invoking at least one of the grounds set forth in F.R.Civ.P. 59 or 60(b), must be articulated if B.Rule 3008 is to be successfully invoked (citations omitted). Mere neglect is clearly insufficient cause for reconsideration (citations omitted).

We also reiterated our statement in *In re Owens*, 67 B.R. 418, 422 (Bankr.E.D.Pa. 1986) ("*Owens I*"), *aff'd sub nom. United States v. Owens*, 84 B.R. 361 (E.D.Pa.1988) ("*Owens II*"), that the language of F.R.B.P. 9023 eliminates the requirement that a motion for reconsideration must be served within 10 days as to motions under F.R.B.P. 3008. *Motor Freight, supra*, 91 B.R. at 710. However, although eschewing the 10–day bright-line time-period, we suggested that laches or delay was still an important factor to consider in deciding a Rule 3008 motion. *Id.*

In *Owens I*, we granted the IRS' motion for reconsideration of a denial of a supplemental proof of claim which had been served after the 10–day period, to the ex-

---

**1.** This figure was adopted from the Debtor's subsequent Memorandum which alleges that this is the correct amount of the undisputed taxes. This amount differs from the figure of $351,153.43 listed in the Debtor's Motion.

tent that we considered its motion on its merits. 67 B.R. at 422–23. However, we denied the motion on its merits because we found that the attempt of the IRS to amend its proof of claim was after the bar date and, considering its effect of precluding the debtor's fragile but otherwise-viable prospects for reorganization, was inequitably tardy. *Id.* at 425. *See also In re Metro Transportation Co.*, 117 B.R. 143, 148 (Bankr.E.D.Pa.1990) (although a claimant may amend the amount of a claim after the bar date, the claimant generally may not amend a claim to change the nature of the claim at that time). We also noted that the IRS would possibly retain a viable post-petition claim outside of bankruptcy against the Debtor even if its supplemental proof of claim were disallowed. *Id.* *But see Owens II*, 84 B.R. at 363–64 (district court questions the validity of the IRS' post-petition claim, but nevertheless affirms this court's disallowance of the attempted amendment of the claim).

 What troubles us about both parties' Motions are those aspects which seek to belatedly repudiate the pleadings upon which the result in *Compass I* was based. The IRS effectively seeks to amend its claim, not only after the bar date and not only three years after confirmation of the plan and its consummation, but also after the validity of its claim has been decided. The Debtor effectively seeks to revise its Objection not only well after the decision, but over one month after the IRS filed its own Motion and after it had answered the Motion making no such claims. We also must consider the fact that both parties totally neglected seeking a resolution of the Debtor's tax liability for not only three years after confirmation, but also until after the underlying case was closed.

In light of the foregoing equitable considerations, we are not prepared to allow either party to present a post-trial revisionist version of their pleadings in this case. We conclude that the IRS is bound by its Claim and the Debtor is bound by its Objection. *Cf. In re Kreidle*, 143 B.R. 941, 946 (D.Colo.1992) (IRS estopped from assessing additional taxes after plan confirmation).

 While the foregoing conclusions limit the relief which the parties can expect to receive from this court at this juncture, they do not eliminate relief on the Motions entirely. A careful re-review of the trial transcript at pages 132–33 reveals that it contains no reference to any stipulation between the parties that all of the penalties for the tax years 1985 and 1986 were paid by the Debtor. The parties in fact therein stipulated that only corporate miscellaneous penalties for the period December, 1982, through December, 1984, had been paid. Accordingly, the IRS is entitled to recover penalties for 1985–86 if same were included in its Claim.

A review of the IRS' Claim reveals that no amounts were claimed for penalties for the tax years 1985–86 in connection with the disputed taxes. However, as the Objection makes clear, in acknowledging that the IRS seeks "$595,399.27, plus interest and penalties thereon," the parties assumed that penalties and interest were to be added to the amount of the IRS' Claim. Hence, the absence of reference to these penalties in the Claim does not foreclose the IRS' recovery of such amounts at this time.

The IRS points out that, in a proposed joint exhibit which was erroneously never included in the record, the Debtor agreed that the 1985–86 penalties were properly calculated at $6,671.40. The Debtor does not deny the accuracy of these calculations, although it refused to stipulate that the exhibit was or should have been part of the record, and it argued vigorously that the joint exhibit was not intended to effect an amendment to the IRS' Claim. Because we find that allowance of this sum is not inconsistent with the IRS' Claim, we will add the $6,671.40 penalties to the amount properly due to the IRS in the Claim.

 With respect to its demand for additional interest, the IRS contends that the Debtor's taxes for the last quarter of 1986 are post-petition taxes and constitute an administrative claim upon which interest may accrue, irrespective of the recitation in its Claim that taxes for this period are pre-petition. Also, the IRS contends that the

status of the Claim as to taxes due in the last quarter of 1986 as post-petition was agreed to in the Debtor's consent to the contents of the joint exhibit. The exhibit does indeed contain an accounting of the taxes, interest, and penalty for all of the disputed 1985 and 1986 taxes. However, it makes no reference to whether the taxes referenced are pre-petition or post-petition.

We decline the IRS' request for additional interest for several reasons. Firstly, the joint exhibit relied upon by the IRS was never made part of the court record. The record is unclear why the exhibit was not made part of the evidence and suggests that the exhibit was to be submitted at a later date following a review of the tax figures by the parties. The Debtor now disputes that it agreed that the exhibit would become part of the record and the fact that it did not becomes significant.

Secondly, the joint exhibit does not address the issue of which taxes are pre-petition and which are post-petition.

Thirdly, the contention that *any* of the disputed taxes are post-petition is inconsistent with the Claim. This is not a situation where, as in the case of the penalties in dispute, the issue was not addressed by the Claim and the element in issue was implicitly allowable. As we stated previously, we will not allow the IRS to change its Claim at this juncture.

■ We also note that the IRS argues that it is entitled to interest because the fourth quarter taxes are properly classified as an administrative claim, which is not subject to the proscription on payment of interest in § 502(b)(2). Thus, the IRS is attempting to change the nature of part of its claim from priority to administrative. Such a change in the nature of a claim, well after the bar date, is generally prohibited. *See Metro Transportation, supra,* 117 B.R. at 148. It is particularly difficult to reclassify a claim as administrative after distribution has been made. No funds remain to allow a distribution consistent with such a classification.

Further, we note that this court has consistently held, contrary to what the IRS apparently supposes, that interest on post-petition, administrative claims is not itself entitled to administrative-claim status. *See In re Motor Freight Express,* 1988 WL 47601, at *2 (Bankr.E.D.Pa.1988); and *In re American Int'l Airways, Inc.,* 77 B.R. 490, 494–95 (Bankr.E.D.Pa.1987). Thus, administrative status of a portion of the amount claimed may not change the rights of the IRS to interest.

Finally, we note that, if the IRS is correct that these claims are post-petition, it appears that they would be non-dischargeable and possibly collectible against Christiana in any event. Thus, as in *Owens,* 67 B.R. at 425, the IRS would not appear to be seriously prejudiced by this court's refusal to allow a belated amendment to the IRS' Claim. Since distribution has been made by the Debtor, the only source of collection of any of its claims is Christiana, and that fact is unchanged by the result of the allowance of any claims in the context of this bankruptcy case.

For all of these reasons, we decline the IRS' invitation to append additional interest to its Claim.

■ The Debtor has requested that we reconsider our Order and amend it to include 1984 as part of the period to which the undisputed tax liability applies and to reduce the undisputed portion of the IRS' Claim from $400,437.37 to $350,279.66. The Debtor contends that the latter figure is the correct amount and the former a result of an error in the court's computation.

The Debtor's request that 1984 be added to the periods covered by the undisputed taxes is granted, since the Debtor is correct that the court inadvertently omitted the reference to that tax year from its Order.

However, the Debtor's far more significant request to reduce the undisputed portion of the taxes must be denied. The IRS' Claim listed a tax liability against the Debtor in the total amount of $595,399.97, plus penalties and interest. In its Objection to the Claim, the Debtor sought to reduce the Claim by $194,961.90, plus penalties and interest thereon, alleging that the additional taxes which the IRS sought to impose

were incorrectly assessed as to parties who were independent contractors. Mathematically, it is inescapable to conclude that the Debtor raised no objection or disputed in any manner the remaining balance of $400,437.37.

It must be recalled, as noted in *Compass I*, at 144–45, that those aspects of a proof of claim which are not challenged are presumed valid. *See, e.g., In re Allegheny Int'l, Inc.,* 954 F.2d 167, 173 (3rd Cir.1992). The Debtor presented absolutely no evidence at trial that the "undisputed" portion of the Claim was invalid. Furthermore, the Debtor did not address the inaccuracy of the "undisputed" amount in any of its Briefs or pleadings until its filing of the Debtor's Motion, six weeks after the issuance of *Compass I*. Since the Debtor did not object to the amount of the "undisputed" portion of the Claim prior thereto, it should not be able to rely upon its Motion as a vehicle to do so.

Accordingly, that aspect of the Debtor's Motion seeking to reconsider and reduce the amount of the "undisputed" portion of the Claim must be denied.

An Order consistent with the conclusions expressed herein will be entered.

### ORDER

AND NOW, this 28th day of October, 1992, upon consideration of the Motions for Reconsideration of our Order of August 27, 1992, filed by the Internal Revenue Service ("the IRS") and by the Debtor, it is hereby ORDERED AND DECREED as follows:

1. The IRS' Motion is GRANTED in part and DENIED in part.

2. The Debtor's Motion is GRANTED in part and DENIED in part.

3. The IRS' request that we add to its Claim the amount of $6,671.41 for penalties is GRANTED. All other aspects of the IRS' Motion are DENIED.

4. The Debtor's request that we add a reference to the inclusion of 1984 taxes to those covered by our Order is GRANTED. All other aspects of the Debtor's Motion are DENIED.

5. Paragraph 2 of our Order of August 27, 1992, is VACATED and MODIFIED to recite that the IRS is allowed, in addition to its Claim of $400,437.37 for unpaid 1984, 1985, and 1986 taxes, a claim in the amount of $195,625.29 for unpaid taxes, $40,540.15 for interest, and $6,671.40 for penalties, or a total Claim against the Debtor of $643.274.21, for tax years 1982 through 1986.

6. A status conference to determine if and when a Final Decree can be re-entered in this case and it can be reclosed is re-scheduled.